*In re* I.D., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Rosalee Dorsey, Respondent-Appellant).—*In re* I.D., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Jonathon Carter, Respondent-Appellant).

Fourth District   Nos. 4—89—0885, 4—89—0915 cons.

Opinion filed November 29, 1990.

Lynne R. Feldman, of Kirtley-Pavia-Marsh, of Urbana, for appellants.

Thomas J. Difanis, State's Attorney, of Urbana (Kenneth R. Boyle, Robert J. Biderman, and Timothy J. Londrigan, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Michael Q. Jones, of Urbana, guardian *ad litem*.

JUSTICE LUND delivered the opinion of the court:

On October 3, 1989, the circuit court of Champaign County entered an order finding the respondent mother, Rosalee Dorsey, and respondent father, Jonathon Carter, to be unfit parents as defined by section 1 of the Adoption Act (Ill. Rev. Stat. 1989, ch. 40, par. 1501). On November 6, 1989, following a dispositional hearing, the court entered an order terminating the parental rights of both respondents and appointing a guardian for I.D. with the authority to consent to her adoption. These appeals followed.

On July 31, 1987, a petition was filed pursuant to the Juvenile Court Act of 1987 (Juvenile Court Act) (Ill. Rev. Stat. 1989, ch. 37, par. 801—1 *et seq.*), alleging that I.D., born March 16, 1985, was an abused minor. After the adjudicatory hearing, the court specifically found that respondent father had sexually abused two older girls at the residence while I.D. was in the residence, and that this conduct created a dangerous environment. The court also found that respondent mother had been advised of this abuse by the victims but, due to her mental limitations, she was unable to deal with and respond to the situation. Thus, she would be unable to protect I.D. if necessary.

The court also observed the evidence established that I.D. was greatly delayed in expressive verbalization, and it was the expert's opinion that the environment I.D. lived in had caused much of the delay. Accordingly, the court found I.D. was abused in that the environment she lived in with respondents was injurious to her welfare. (Ill. Rev. Stat. 1989, ch. 37, par. 802—3(1)(b).) The court ordered I.D. removed from the home and ordered a long list of remedial measures for the parents, including a course of counseling as recommended by the Department of Children and Family Services (DCFS).

On June 25, 1989, a petition seeking termination of respondents' parental rights was filed. In regard to the mother, it was alleged that she is unfit in that she is unable to discharge her parental responsibilities due to a mental impairment, and that there is sufficient justification to believe that such inability to discharge parental responsibilities shall extend beyond a reasonable time. (Ill. Rev. Stat. 1989, ch. 40, par. 1501(D)(p).) The petition alleged that the father was unfit in that he failed to make reasonable efforts to correct the conditions which were the basis for removal of the minor from him, within 12 months after the adjudication of abuse; and, alternatively, that he failed to make reasonable progress toward the return of that minor within 12 months after the adjudication of abuse. Ill. Rev. Stat. 1989, ch. 40, par. 1501(D)(m).

The hearing on this petition was conducted on October 3, 1989. Dr. Ronald Matthew, a clinical psychologist and director of the Moultrie County Counseling Center, testified that he conducted an assessment of respondent mother in 1987, which showed she is in the mild-retardation range, with an IQ of 53. This is comparable to a mental age of five or six years old. He believed she would have a difficult time managing herself without supervision. In regard to being a parent, it was his opinion that she would be quite limited and would be subject to poor judgment and deficiencies in being able to communicate. He was especially concerned with emergency situations or situations other than routine tasks. He believes she could be trained to handle the simple routine matters, but that she is incapable of addressing changing circumstances and that some high-risk situations might occur.

He has reviewed subsequent reports on the mother, and he conducted another interview with her in June 1989. It was his opinion that her intellectual functioning has remained quite static during that time. Further, he believed that there is not a very good prospect for improved functioning with her parenting skills in the future.

Cheryl Hutton, case coordinator for the Developmental Services

Center, testified that respondent mother has been receiving services with them since 1988. She currently works 26 hours per week in the workshop. She lives in one of the agency's apartments and receives services from their program staff. They teach her domestic things such as cooking, cleaning, and monitoring of her money. She is also involved in educational programs and has recently learned to tell time. She now gets herself up, makes lunch, catches the bus, and gets to work on time. It is their goal that she eventually learn to live independently, although they will continue to offer support services for as long as they are needed. They are hopeful respondent will be able to move out without so much support by August 1990.

Cassandra Woolfolk is a therapist at the Champaign County Mental Health Center. She testified she met with respondent father and the DCFS caseworker on February 15, 1989, to set up a counseling program. Since there was a waiting list, an appointment could not be made immediately. A letter was sent to him advising him of his appointment time. She did not hear from him again.

Larry Brannon is the counselor respondent father was to meet. The original appointment was for March 20, 1989. Respondent failed to call to cancel the appointment or to appear. Brannon had no contact from that date until August 7, 1989, at which time respondent called to set up a meeting. The appointment was scheduled for August 14, 1989. Respondent failed to call or cancel. Respondent called later seeking an appointment, but Brannon was on vacation. Both Brannon and Woolfolk were aware that respondent had difficulty reading, but respondent had advised there was someone who would read the mail to him.

Sharyne Wilson-Pendleton is the DCFS worker who has been involved with this case the entire time. She stated the initial client-service plan developed on July 30, 1987, for respondent father included a requirement that he participate in counseling. At that time, he was also supplied with the address and phone number of the Champaign County Mental Health Center. On January 22, 1988, a review meeting was held, and he was again admonished as to the counseling requirement. At the June 1988 and January 1989 reviews, this goal was again emphasized. In November 1988, respondent father was granted immunity from any prosecution based on any comments made during his counseling, to encourage him to comply. She also met monthly with respondent, at which time she further advised him of the need to begin his counseling. He did not attend any counseling.

In January 1989, he told her that he had been too busy to attend. Wilson-Pendleton then telephoned the mental health center for him to

find out when Woolfolk would be available. This information and the phone number for the mental health center were given to respondent. In February 1989, he told her he had not gone to counseling due to conflicts. The final case review was on July 26, 1989. At that point, respondent indicated that he had attempted to call Woolfolk, but that he was too busy to attend counseling. Wilson-Pendleton then dialed the phone for the mental health center so that respondent could talk with Brannon. However, Brannon was not in.

Wilson-Pendleton testified that respondent mother was cooperative in complying with the services supplied to her. However, it was Wilson-Pendleton's opinion, due to respondent mother's limited functioning ability, that she is unable to care independently for I.D. She observed there is no support from family members who could assist her in day-to-day care.

The court, after hearing arguments, concluded the burden had been met and found both parents unfit for the reasons alleged. A dispositional hearing was held on November 6, 1989. At that time, the court terminated the parental rights of both parents and appointed a guardian for I.D. with authority to consent to an adoption. Both the mother (No. 4—89—0885) and the father (No. 4—89—0915) appealed, and the appeals have been consolidated.

Respondents' first argument is that the statutory provision under which the mother was found unfit is unconstitutional. Section 1(D)(p) of the Adoption Act provides that a parent is unfit if there is an "inability to discharge parental responsibilities supported by competent evidence from a psychiatrist or clinical psychologist of mental impairment, mental illness or mental retardation *** or developmental disability *** and there is sufficient justification to believe that such inability to discharge parental responsibilities shall extend beyond a reasonable time period." (Ill. Rev. Stat. 1989, ch. 40, par. 1501(D)(p).) Respondents simply assert, without much citation or argument, that this provision is violative of the due-process and equal-protection provisions of the constitution.

■ Our supreme court has frequently emphasized that there is a strong presumption that legislative enactments are constitutional. (*People v. Roos* (1987), 118 Ill. 2d 203, 209, 514 N.E.2d 993, 996; *People v. Greene* (1983), 96 Ill. 2d 334, 338, 450 N.E.2d 329, 331.) Accordingly, the one who asserts otherwise has the burden of clearly establishing the constitutional violation. *Roos*, 118 Ill. 2d at 209-10, 514 N.E.2d at 996; *Sayles v. Thompson* (1983), 99 Ill. 2d 122, 125, 457 N.E.2d 440, 442.

The starting point for any due-process or equal-protection analysis

is the selection of the proper test to be applied. We are not aware of, nor have the parties cited, any case in which our supreme court or the United States Supreme Court has directly decided the appropriate test for a constitutional challenge to a statutory ground for a finding of parental unfitness. In *Regenold v. Baby Fold, Inc.* (1977), 68 Ill. 2d 419, 436-37, 369 N.E.2d 858, 866, our supreme court, in addressing a constitutional challenge to parts of the Adoption Act, observed it was necessary to balance the concern of the State, as *parens patriae*, with the right of a parent to custody of her child. The court observed this parental right has been recognized as a right protected by the fourteenth amendment and may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the State to enact.

■ Thus, it appears from the language that the proper test for the due-process and equal-protection claims is the rational-basis test. (Accord *In re Ray* (1980), 88 Ill. App. 3d 1010, 1012-13, 411 N.E.2d 88, 90-91.) This provides that a statute will be upheld in the face of a due-process challenge, if it bears a rational relation to a legitimate State purpose and is neither arbitrary nor discriminatory (*Harris v. Manor Healthcare Corp.* (1986), 111 Ill. 2d 350, 368, 489 N.E.2d 1374, 1382) and, when faced with an equal protection argument, it will be upheld as long as the distinctions drawn bear some rational relationship to a legitimate State end (*Harris*, 111 Ill. 2d at 371, 489 N.E.2d at 1383).

■■ The State as *parens patriae* has a right and duty, as well as the authority, to legislate for the protection and welfare of children within its jurisdiction. (*Regenold*, 68 Ill. 2d at 437, 369 N.E.2d at 866.) Our legislature has done so by enacting the Juvenile Court Act and the Adoption Act. These have created a comprehensive scheme to ensure children receive the proper care and training. They authorize the removal of the children from the home if necessary. The ultimate goal is to reunite the families. However, the legislature recognizes there are those cases wherein this cannot be readily done. In such situations, it is the intent of the acts to avoid placement of children in long-term or permanent foster care with the accompanying detrimental impacts to the children by encouraging placement in a permanent, stable adoptive home. Section 1(D)(p), the section in question, is clearly rationally related to this goal. Not all parents with these disabilities are affected. It is only those who cannot discharge their parental responsibility due to these disabilities *and* whose inability to do so will extend beyond a reasonable time. In such circumstances, it is

necessary to ensure stability and an appropriate family life for the minor in a permanent family relationship. There is no constitutional defect.

Respondents next contend the court erred in finding respondent mother to be unfit. As this court noted in an earlier case, a proper analysis under section 1(D)(p) of the Adoption Act involves two steps. First, it must be shown by competent evidence that the parent suffers from a mental inability sufficient to prevent him or her from discharging a parent's normal responsibilities and, second, there must be sufficient justification to find that the inability shall extend beyond a reasonable time period. (*In re E.J.F.* (1987), 161 Ill. App. 3d 325, 331, 514 N.E.2d 544, 548.) Respondents acknowledge that mental impairment of respondent mother was established, but insist the record fails to establish that she cannot now discharge her parental duties or that any inability of this nature would continue into the future.

In order for the trial court to find parental unfitness, there must be clear and convincing evidence to support such a finding. (*In re Paul* (1984), 101 Ill. 2d 345, 352, 461 N.E.2d 983, 986.) However, the question on review is whether the finding of the trial court is against the manifest weight of the evidence. (*In re C.P.* (1989), 191 Ill. App. 3d 237, 244, 547 N.E.2d 604, 608.) It is not the function of the reviewing court to reweigh the evidence or reassess the credibility of witnesses. (*In re C.P.*, 191 Ill. App. 3d at 244, 547 N.E.2d at 608.) Great deference is given to the findings of the trial court since the judge had the opportunity to view the witnesses and evaluate the testimony. (*In re R.M.B.* (1986), 146 Ill. App. 3d 523, 527-28, 496 N.E.2d 1248, 1251.) For a finding to be against the manifest weight of the evidence, the opposite result must be clearly evident from a review of the evidence. *Stone v. City of Arcola* (1989), 181 Ill. App. 3d 513, 530-31, 536 N.E.2d 1329, 1340.

There is no such difficulty with this case. The record discloses that one of the main reasons I.D. was adjudicated abused was due to the mother's inability to protect her or to understand how to deal appropriately with the allegations of sexual abuse. It should be remembered that the mother was assessed as having an IQ of 53 and a mental age of five or six years old. Further, I.D. was developmentally delayed, which was attributable to the inability of the mother to provide a sufficiently enriching atmosphere to allow I.D. to develop normally. The record also establishes that mother had difficulty taking care of herself, let alone taking care of herself with I.D. present. Thus, there is sufficient evidence to establish the mother's inability to discharge her parental responsibilities in 1987.

The termination hearing also established the likelihood of this inability continuing beyond a reasonable time frame. Dr. Matthew testified that the mother's abilities had remained basically static over the two-year period. He acknowledged she could learn routine tasks, but opined that she would be unable to adjust to constantly changing circumstances. Unfortunately, these are just the circumstances that one would face raising a young child. Dr. Matthew also believed these difficulties would continue, and he was concerned about a high-risk situation developing if I.D. was returned to the care of her mother. This evidence is sufficient. Admittedly, the mother has made some progress and learned some skills. It is hoped her development will continue. However, the fact that after two years she has learned to tell time, get up by herself, and ride the bus to work (while a tremendous achievement in itself) is hardly the sort of development which would indicate she will, in the reasonable future, be able to discharge her parental responsibilities.

Respondents next complain that the finding of unfitness against respondent father is improper because the wrong standard of proof was applied. They observe that the court's finding at the 1987 adjudicatory hearing that he abused the other girls was based on the preponderance-of-the-evidence standard. They maintain the court is now terminating respondent father's parental rights based on that finding, rather than a finding made by clear and convincing evidence. They believe this "bootstrapping" is improper and the case should be reversed. See *In re Enis* (1988), 121 Ill. 2d 124, 520 N.E.2d 362.

However, respondents misapprehend the nature of the court's termination findings. The court is not finding respondent father unfit based on that earlier conduct. Rather, the court's findings were based on new conduct. That conduct is the failure of the father to make reasonable efforts and reasonable progress toward the return of I.D. within 12 months after the earlier adjudication. (Ill. Rev. Stat. 1989, ch. 40, par. 1501(D)(m).) It is to this determination that the clear and convincing standard applies. The first finding is only relevant as a starting point for the 12 months. Thus, the proper standard was applied and there can be no argument, based on father's failure to receive the requested counseling, that the determination of the court's finding him unfit is correct.

Finally, respondents insist the court erred by terminating their parental rights at the dispositional hearing. They observe the evidence shows they both made most of their scheduled visits, bonded with I.D., and were making improvements. In fact, the mother points out that DCFS recommended her parental rights not be terminated. It

was their suggestion to keep the same status for six months and review how the mother was progressing at that time.

■■ Once the court finds the parents are unfit, as did the court here, the court can, in determining whether to terminate the parental rights, consider the best interests of the minor. (*In re Massey* (1976), 35 Ill. App. 3d 518, 521, 341 N.E.2d 405, 407.) All the parents' rights must yield to the best interests of the child. (*In re T.G.* (1986), 147 Ill. App. 3d 484, 488, 498 N.E.2d 370, 373.) As with other decisions in this context, the appropriate standard of review is whether the court's determination is against the manifest weight of the evidence.

■■ We have little difficulty in agreeing with the court's decision to terminate the father's parental rights based on his age, his lack of effort to obtain counseling following the sexual abuse finding to clarify whether he runs a future risk to I.D., and the fact that he was present in the home during the time that I.D. was found developmentally delayed. The evidence establishes that I.D. has made great progress and is now functioning more appropriately. Admittedly, the father made virtually all the visits, and there was some testimony that his interaction had improved. However, in considering the best interests of I.D., we conclude the decision was appropriate.

■■ We also find the decision involving the mother, while being much more heartrending, to be correct. The evidence presented in the dispositional report establishes that I.D.'s IQ has now increased to the low-normal range. Her developmental lag times have decreased dramatically since she has been in placement. Dr. Matthews' report indicates that research shows children growing up in those homes where poor maternal care and lack of stimulation existed could show an IQ decrease of up to 30 points. It was his opinion that if I.D. did reside with the mother without extensive involvement from outside sources, I.D. would likely show regression in measured behavior.

The record also establishes that I.D. and her mother are affectionate and closely bonded together, and that the mother has made dramatic improvements in certain aspects of her life. However, according to one report, she is still functioning in those areas at only the level of a 13 year old. Also, Dr. Matthews believed that due to her age, if I.D. is permanently placed now, she will be able to cope with the separation.

As the trial court explained, this is a sad, heart-wrenching decision. However, the prime concern is the best interest of I.D. Here, it would simply be speculative to conclude that things will change in six months. In fact, in essence, the court found this was not likely when it found the mother unfit. Even if the mother continued to improve,

the evidence indicates that the return of I.D. to the mother without intensive involvement by others would have negative consequences. The mother has no family to help, and the level of government funding and resources is always questionable. Thus, there is a real concern whether the support will be there. While there will be trauma for I.D. at the separation, she is only five years of age and will have an opportunity to become part of a new, stable family unit which will better meet her needs. The decision by the trial court was emotionally difficult, but was ultimately correct.

Affirmed.

SPITZ and McCULLOUGH, JJ., concur.