*In re* J.S. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Janet Slater, Respondent-Appellant).

Third District   No. 3—90—0330

Opinion filed April 30, 1991.

William C. Davis, Jr., of Lewistown, for appellant.

Joan Scott, State's Attorney, of Lewistown (Gary F. Gnidovec, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BARRY delivered the opinion of the court:

Janet Slater appeals from orders entered by the circuit court of Fulton County finding her an unfit person pursuant to sections 1(D)(m) and (D)(p) of the Adoption Act (Ill. Rev. Stat. 1989, ch. 40, pars. 1501(D)(m), (D)(p)) and terminating her parental rights to her

four natural children. For purposes of this opinion, we will refer to the children as J(son), J.S., T.S. and S.S.

Janet was born in 1963. She has a history of mental illness diagnosed as bipolar disorder and antisocial personality disorder with poly-drug abuse since the age of 17. Her first child, J(son), was born in 1982. Thereafter, she gave birth to J.S. in 1983, T.S. in 1985 and S.S. in 1986.

Within a few months of the birth of T.S., Janet was taken involuntarily to Zeller Mental Health Center (ZMHC) when she was found with J(son) near a pool of muddy water and fertilizer and was unwilling or unable to speak to either the child or the police. The child had been playing in the polluted water. The children's father, Donald (Tater) Slater, had been drinking. He became intoxicated, threatened to commit suicide and passed out. Subsequently, an aunt provided temporary shelter for the children. However, as a consequence of the incident and the parents' subsequent refusal to cooperate with the Department of Children and Family Services (DCFS), in August 1985, DCFS brought suit for an adjudication of wardship and temporary custody on the ground of neglect.

The parties stipulated to a finding of neglect, and the children were placed in foster care with guardianship in the Guardianship Administrator of DCFS. The children were returned to the Slaters' custody in February 1986.

Then, within a couple of months after the birth of her fourth child, S.S., Janet was readmitted to ZMHC when she became violent, and a second petition was filed by DCFS seeking custody of the children on grounds of abuse and Janet's mental health problems. Pursuant to the parties' stipulation, a second adjudicatory order was entered in November 1986 finding the children dependent and abused. The children were returned to their parents' custody after Janet's release from ZMHC. Janet and Tater were divorced in December of that year.

On March 30, 1987, before the matter came back up for a dispositional hearing, Janet was once again admitted to ZMHC for aggressive, hostile behavior. The children were again placed in foster care. Janet was released on May 15, but was returned on May 27 after verbally abusing and physically assaulting her DCFS caseworker during a scheduled supervised visit with the children. This hospitalization lasted until June 16.

On May 21, 1987, the children were placed together in the foster home where they have remained ever since. Within six weeks of their

placement, Mrs. Douglas, the foster mother, reported to DCFS that the children appeared to have been sexually abused.

Mrs. Douglas' report was investigated, abuse was indicated, and the children were given physical and psychological examinations and child sexual abuse therapy. Visitation between Janet and the children was terminated and a second supplemental petition was filed alleging, *inter alia*, sexual abuse and seeking a termination of the Slaters' parental rights by reason of depravity (Ill. Rev. Stat. 1989, ch. 40, par. 1501(D)(i)), failure to protect the children from an injurious environment (Ill. Rev. Stat. 1989, ch. 40, par. 1501(D)(g)) and failure to make reasonable progress toward the return of the children (Ill. Rev. Stat. 1989, ch. 40, par. 1501(D)(m)).

The adjudicatory hearing on this petition was continued on the Slaters' motions for various reasons, including Janet's readmission to ZMHC on November 20, 1988. Prior to that admission, however, the court heard testimony *in camera* of J.S. and J(son). The children's testimony was tape-recorded so that it could be reviewed by Janet and her attorney before the children were cross-examined. J.S.' testimony, direct, cross and redirect, was completed in this manner on November 1, 1988; however, the cross-examination of J(son) was not pursued before the court recessed for the day. As a result of Janet's involuntary readmission, the adjudicatory hearing was again continued. Janet was released December 13, but readmitted December 23, 1988, and remained at ZMHC this time until March 3, 1989. During this period, Donald (Tater) voluntarily consented to the termination of his parental rights.

A third supplemental petition was then filed in January 1989, naming only Janet and seeking the termination of her parental rights on grounds of depravity, failure to make reasonable progress and Janet's inability to discharge parental responsibilities by reason of her "periodic mental disability" (Ill. Rev. Stat. 1989, ch. 40, par. 1501(D)(p)). After numerous mesne motions and continuances, the adjudicatory hearing on the third supplemental petition was held in September, October and November, 1989 and February 1990.

At the adjudicatory hearing, Mrs. Douglas described the circumstances that led to her report to DCFS of suspected sexual abuse. She testified that initially the baby, S.S., would scream and push away when she tried to hold him. He did not respond positively to touching until about six months after his placement in her home. T.S. during this period used to awaken during the night wet with perspiration and crying. He told her that Janet and Tater hurt him and that he was afraid. J.S. displayed an extreme fear of loud noises, especially fire-

works, and was unusually flirtatious with strangers. She tried to fondle Mrs. Douglas' breasts and said that she wanted to have a "booby party." After visitation with Janet, Mrs. Douglas stated, J.S. would act out sexually, taking T.S.' pants down and playing with his penis and poking her finger into his anus "to see if he had any poop." J.S. also tried to disconnect or break the Douglases' videocassette recorder, reportedly because she had seen pictures of herself and her brothers being hurt at her mother's house. J(son) confided that the Slaters had taken pictures of the children in the nude, that during the filming Tater had urinated and defecated on him, and that Janet had put a lighted match up to T.S.' penis. Mrs. Douglas' testimony of J(son)'s and J.S.' descriptions of other acts of depravity, human and animal torture and sexual abuse during their life with Janet appears in the record on appeal, but need not be repeated to any greater extent for purposes of this opinion.

The foster parents indicated their willingness to adopt all four children in the event they become legally available for adoption.

Expert evidence introduced by DCFS in support of the petition established that J(son) and J.S. had been traumatized by their experiences while living in Janet's home. Based on his physical examination of the children on January 20, 1988, Dr. Richard Miller testified that J.S.' hymenal membrane was missing and that this finding was consistent with the child's report to her foster mother that objects had been forced into her vagina. It was his opinion that J.S. had been sexually abused. The doctor's examination of the other children neither confirmed nor rebutted their reports of abuse.

The children's counselor, Diane Ramer, conducted nine sexual abuse therapy sessions with J(son) and 12 with J.S. She helped them to talk about their feelings, fears and pain and to alleviate their guilt. Based on what the children said and how they acted as they opened up during their sessions with the counselor, it was her opinion that the children were not lying about the abuse they had suffered in the Slater home and that they had been emotionally traumatized.

J(son) testified about his recollection of the experiences of physical and sexual abuse that he had seen and participated in in the Slater home. He expressed fear and anger toward Janet. J(son)'s 14-year-old foster brother, G.W. Douglas, testified that he had shared his bedroom with J(son) since his placement in 1987 and the two boys had had private conversations about J(son)'s life in the Slaters' home. Many of the incidents of abuse related by J(son) to the court had been revealed to G.W. during these discussions which began as early as June or July 1987. G.W. also testified that while changing T.S.' diapers, he had ob-

served that the baby's penis was scarred. Mrs. Douglas also testified in some detail about J.S.' private talks with her about abuse in the Slater home. The details in many respects coincided with G.W.'s testimony of reports given by J(son) to G.W. and with J(son)'s testimony as received by the court *in camera*.

Expert witnesses who had treated Janet at ZMHC and at the Community Mental Health Center for Fulton and McDonough Counties testified to Janet's mental illness. Although these witnesses had not observed Janet with her children, they generally testified to her long-term unstable, antisocial behavior, periodic bouts with out-of-control aggression apparently related to stress and her substantial history of drug abuse.

In her defense, Janet established that since her most recent hospitalization, she had acknowledged her mental illness, was taking her medication, and had learned to recognize symptoms of periodic relapses (pacing, preoccupation with religion and insomnia) which indicated that increased medication was needed. DCFS homemakers who had supervised visitation prior to November 1987 testified that on most occasions Janet had acted appropriately toward the children and they had not appeared afraid of her. Finally, Janet and her father and stepmother testified to Janet's love and affection for her children and their show of affection for her.

At the conclusion of all evidence, the court took the matter under advisement and issued a memorandum opinion on February 26, 1990, finding that the evidence clearly and convincingly established that: (1) with respect to Janet's inability to discharge her parental responsibilities, "a regression is probable and that Janet is not even remotely able to discharge her parental responsibilities"; and (2) with respect to her failure to make reasonable progress toward the return of her children, "there has been virtually *no* progress *** [and] there seems to be *no* prospects of the children returning in the foreseeable future." (Emphasis in original.) With respect to depravity, the court found "that although there was bothersome evidence, it probably did not rise to the level of clear and convincing." An order adjudicating Janet an unfit person pursuant to sections 1(D)(m) and (D)(p) of the Adoption Act was entered on March 1, 1990.

The matter then proceeded to a dispositional hearing. After receiving DCFS' updated report and further testimony from Mrs. and Mr. Douglas, Janet and her father and stepmother, the court found by clear and convincing evidence that "it is in the best interests of [the] minors that the parental rights of Janet Slater be terminated." Hav-

ing reviewed the entire record before us in this appeal, we now affirm the circuit court's adjudicatory and dispositional orders.

■ Janet first contends that section 1(D)(p) of "An Act in relation to the adoption of persons, and to repeal an act therein named" (Adoption Act) (Ill. Rev. Stat. 1989, ch. 40, par. 1501(D)(p)) is unconstitutional because it deprives her of equal protection and due process of law. Contrary to Janet's argument, we find that the statute is neither vague nor inherently confusing and incapable of reasonable application. The constitutional challenges advanced here were generally addressed in *In re I.D.* (1990), 205 Ill. App. 3d 543, 549-50. In our opinion, the court's rationale in *I.D.* adequately responds to Janet's constitutional arguments. In holding that the statute is not constitutionally defective, the court stated:

> "The State as *parens patriae* has a right and duty, as well as the authority, to legislate for the protection and welfare of children within its jurisdiction. (*Regenold* [*v. Baby Fold, Inc.* (1977)], 68 Ill. 2d [419,] 437, 369 N.E.2d [858,] 866.) Our legislature has done so by enacting the Juvenile Court Act and the Adoption Act. These have created a comprehensive scheme to ensure children receive the proper care and training. They authorize the removal of the children from the home if necessary. The ultimate goal is to reunite the families. However, the legislature recognizes there are those cases wherein this cannot be readily done. In such situations, it is the intent of the acts to avoid placement of children in long-term or permanent foster care with the accompanying detrimental impacts to the children by encouraging placement in a permanent, stable adoptive home. Section 1(D)(p), the section in question, is clearly rationally related to this goal. Not all parents with these disabilities are affected. It is only those who cannot discharge their parental responsibility due to these disabilities *and* whose inability to do so will extend beyond a reasonable time. In such circumstances, it is necessary to ensure stability and an appropriate family life for the minor in a permanent family relationship. There is no constitutional defect." (Emphasis in original.) (205 Ill. App. 3d at 549-50.)

We embrace the foregoing analysis and reject accordingly Janet's constitutional challenges.

Janet next contends that the circuit court's findings of unfitness are contrary to the manifest weight of the evidence.

■ As a general rule, the trial court has broad discretion in matters of family relationships and its evaluations of questions of credibil-

ity and weight assignable to the evidence should not be disturbed on appeal unless they are palpably contrary to the manifest weight of the evidence or the court abuses its discretion. (*In re Grotti* (1980), 86 Ill. App. 3d 522, 408 N.E.2d 728.) Particularly where, as here, it is apparent that the parent is treading a precarious line in dealing with the stresses of her life and it is clear from the record on appeal that the trial court fully grasped the magnitude of its decision, this court should be loath to upset the lower court's rulings.

Based on the totality of the evidence before it, the trial court concluded that Janet's mental illness was such that she could not be expected to be able to discharge parental responsibilities within a reasonable period of time. The trial court also concluded that Janet had made "virtually no progress" toward the return of her children.

Janet places heavy reliance on the fact that expert witnesses who testified concerning her mental illness could not conclusively state that respondent could not perform her parental duties if she continued in remission and took her medication.

While it is true that most of the experts who testified had either never seen Janet with her children or had seen her with them only during supervised visitation and had not noticed any mistreatment, it is also true that the expert witnesses observed that Janet's prognosis was not favorable for maintaining sufficient control to function outside of the hospital for a significant period of time. Expert testimony also established that given Janet's history it was not likely that she would be able to provide adequate parenting for four young children and that it was highly probable that Janet would resume her abuse of drugs and/or alcohol. Janet's history in dealing with stress is well documented during the period that this case has languished in the circuit court. From mid-1985 until a few months prior to the completion of the adjudicatory hearing in 1990, Janet's antisocial conduct required that she be confined on no less than seven occasions. The record bespeaks of only two occasions on which Janet acknowledged the onset of renewed symptoms of her illness and sought psychiatric help in adjusting her medication without having to be recommitted to the hospital. Both occasions occurred within a few months of the 1989-90 adjudicatory proceedings.

Dr. Iwashita, a clinical psychologist who testified for petitioner, provided a report of his 1989 evaluation of Janet in which he stated:

> "In terms of Symptomatic Pattern, the client is immature, impulsive and hedonistic, and she frequently rebels against authority. She is hostile, quite aggressive and often frustrated. She seems unable to learn from punishing experiences and re-

peatedly gets into the same type of problems. Many individuals with this profile develop severely addictive problems and frequently have legal, family and work difficulties. In terms of interpersonal relations, she may appear charming and tends to make a good first impression, but she is superficial, selfish, hedonistic and untrustworthy in interpersonal relations, apparently only interested in people for how they can be used. She seems interested only in fulfilling her own pleasures, and is not interested in or sensitive to the needs of others. She seems unable to experience guilt over causing others trouble. Because she is unable to form stable, warm relationships, her current relationships are likely to be quite strained. In addition, she is likely to be openly hostile and resentful."

J(son)'s poignant replies during his *in camera* cross-examination reinforce the expert's evaluation:

"Q. Would you laugh and have fun with Janet on those visits at the Department office?

A. No.

Q. What would you do when Janet was around in those visits?

A. Usually she, she pretends she is being nice, but I know she ain't."

The trial court, in rejecting Janet's position that she is in remission and now, after more than three years of not having cared for her children, can take responsibility for them, summarized its findings as follows:

"[Janet's counsel] points out that Janet is recovering from her unfortunate illness and the Court certainly applauds her effort and hopes it is true. However, the Court's mandate is to determine if there is in fact a likelihood, based upon the testimony (which is in the record and familiar to the parties) that she may resume and discharge her parental responsibilities. Sadly the Court must conclude that by clear and convincing evidence a regression is probable and that Janet is not even remotely able to discharge her parental responsibilities."

■ Our review of the record on appeal reveals neither an abuse of the trial court's discretion nor that the court's determination of unfitness was contrary to the manifest weight of the evidence. Janet's acknowledgement in court of her mental illness, as the court aptly noted, represents a great stride in her personal life, but does not translate into progress toward the return of her children. The record before us is replete with evidence of Janet's neglect, abuse—sexual as

well as physical and emotional—and torture of her own children. Even disregarding those uncorroborated aspects of the charges that appear only in the testimony of J(son) and his sister, J.S., the evidence presented to the court clearly and convincingly establishes that Janet abused and neglected all four children. Janet, however, has never admitted any wrongdoing or expressed any guilt, remorse or sorrow for the serious harm done to her children. Whether this factor is a function of Janet's illness or her personality and upbringing is not revealed and need not be determined, but it does lend support to the court's finding of parental unfitness. In sum, without reiterating all of the pathetic factual details underlying this cause, suffice it to say we find adequate evidence to support the trial court's findings of unfitness pursuant to sections 1(D)(m) and (D)(p) of the Adoption Act.

The judgment of the circuit court of Fulton County is affirmed.

Affirmed.

STOUDER, P.J., and McCUSKEY, J., concur.