*In re* A.H. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Donald Hobbs *et al.*, Respondents-Appellants).

Fourth District   No. 4—90—0753

Opinion filed July 11, 1991.—Rehearing denied August 6, 1991.

Donald E. Hobbs and Caren L. Hobbs, both of Decatur, appellants *pro se.*

Lawrence R. Fichter, State's Attorney, of Decatur (Kenneth R. Boyle, Robert J. Biderman, and Dale M. Wood, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

On October 5, 1990, the parental rights of respondents Donald and Caren Hobbs to A.H. (born March 17, 1981), T.H. (born April

17, 1982), and A.H. (hereinafter M.H., using the first initial of her nickname for clarity) (born March 6, 1983), were terminated. Respondents, Donald and Caren, appearing *pro se*, filed an appeal on October 29, 1990. We affirm.

In September 1985, the Department of Children and Family Services (DCFS) received a report alleging the sexual abuse of T.H. by her father, Donald, and a filthy, hazardous home environment. An investigation ensued and, on September 23, 1985, a petition was filed alleging respondents failed to provide the proper or necessary support or other remedial care recognized under State law as necessary for the children. This petition further alleged the children were abused minors because respondents maintained a filthy home which created an environment that was injurious to the health and welfare of the minors. An allegation of sexual abuse by Donald was dismissed from the petition pursuant to an admission of the remaining allegations by respondents. On December 12, 1985, all three children were found to be neglected and abused pursuant to section 2—3 of the Juvenile Court Act of 1987. (Ill. Rev. Stat. 1989, ch. 37, par. 802—3.) On that same date, guardianship was transferred to DCFS.

Thereafter, on April 18, 1986, the dispositional order was modified to allow A.H. to be returned to the custody of Donald and Caren. Respondents regained custody of T.H. and M.H. on October 13, 1986, subject to the continued supervision of DCFS. Donald and Caren were ordered to continue with counseling services and mental therapy was ordered for T.H. Donald and Caren were also ordered to continue cooperating with the homemaker services provided by DCFS. On March 9, 1988, DCFS again removed the children from the custody of respondents because of further allegations of sexual abuse of T.H. and M.H. by Donald. All three minors have been in licensed foster care since that date.

A supplemental petition seeking a finding of unfitness and termination of parental rights was filed on January 19, 1990, alleging respondents were unfit persons pursuant to section 1 of the Adoption Act. (Ill. Rev. Stat. 1989, ch. 40, par. 1501.) Specifically, respondents were alleged to have failed to make reasonable efforts to correct the conditions which were the basis for the removal of the children from them and failed to make reasonable progress toward the return of the children within 12 months of the children being adjudicated neglected and abused minors. After a series of continuances, an adjudicatory hearing was held on April 27, 1990.

At the hearing, the State presented several witnesses, the first of whom was Dr. Victor L. Wilson, an expert in the field of pediatrics. Dr. Wilson testified he examined M.H. and T.H. on March 9, 1988. Dr. Wilson conducted a physical examination of M.H. which revealed a tear in her vaginal opening approximately one-sixteenth of an inch long and one-thirty-second of an inch wide. Dr. Wilson testified there was a strong possibility that penetrating sexual abuse occurred to M.H. on one or more occasions at least three weeks prior to the examination. Dr. Wilson also conducted a physical examination on T.H. That examination showed her vaginal opening was unusually reddened and irritated with an abnormal sticky, white discharge. An analysis performed on the discharge revealed a large number of unfamiliar cells but no particular diagnosis of a sexually transmitted disease was made. Dr. Wilson opined these findings were consistent with sexual abuse.

The second witness to testify was Richard Hazen, a Decatur police officer. Officer Hazen interviewed M.H., who told him her father had put his fingers in her vagina on five separate occasions. M.H. told Officer Hazen this caused her pain but her father said she should tell the police it did not hurt, and that she told her mother, who only asked if it hurt. Officer Hazen also interviewed A.H., who started talking about mice when the issue of sexual abuse arose in the conversation. When Officer Hazen attempted to interview T.H., she began crying hysterically and refused to speak to him.

Linda Wolfe, the foster parent for M.H. and T.H., testified she had custody of the two minors from September 1985 until October 1986 and also from August 1988 to the present. She testified that in August 1988, T.H. told her the sexual abuse by her father had occurred again. T.H. told Wolfe that she had told her mother of this incident but that the mother stated "no, that didn't happen."

Karen Hazen testified that in 1985 she was a child protection investigator for DCFS and, as such, received and investigated reports of child abuse or neglect. Hazen stated she investigated a report of child abuse of A.H., T.H., and M.H. and subsequently found evidence of abuse and neglect through interviews and police reports. Hazen testified she found evidence of sexual abuse in that T.H. was witnessed fondling her father's penis in the bathroom of their home. Hazen further testified there was evidence to show the condition of the home was hazardous evidencing environmental neglect.

The next witness to testify was Pam Waterman, also a child protection investigator for DCFS. She testified in 1986, 1987, and 1988 she received information through hotline reports regarding the sexual abuse of A.H., T.H., and M.H. by their father, Donald. There was evidence to support all three allegations. There also were reports that Donald sexually abused his niece and two neighborhood friends of M.H. and T.H.

Daniel Hocking, a psychologist, testified he first became involved with respondents in November 1985. Donald was referred to Hocking by another counselor for testing and a psychological-emotional evaluation. Hocking conducted a series of tests on Donald and concluded Donald had some sociopathic traits which caused him to have difficulty in conscience development. Hocking testified Donald was unable to empathize with other people and was unaware of how his conduct affected others.

DCFS contacted Hocking again in March 1988, to observe A.H., T.H., and M.H. while they played. He testified he observed the children on four separate occasions and noticed some unusual activity. First, Hocking testified that the children, when he initially met them, immediately began telling him their father had not done anything to them and how bad DCFS was. Hocking stated it was unusual for the children to be this open to a stranger and they did not show any emotion other than anger. Finally, Hocking stated when he met individually with M.H., she told him Donald placed his hand between her legs on one occasion and this also occurred several other times while Donald gave her a bath. When Hocking met with A.H., he stated his father was innocent.

In October 1989, Hocking began counseling sessions with Donald and Caren at the request of DCFS and he sees them every other week for therapy. Hocking testified that a primary goal of the counseling was to educate Donald and Caren about the damage caused by sexual abuse. He explained that a person who sexually abused another person must assume responsibility and the first step toward this is to acknowledge guilt. If this is not done, treatment for the problem will be unsuccessful.

In terms of progress toward addressing the sexual abuse, Hocking testified Donald and Caren are at a standstill. He first acknowledged that they were very consistent in keeping their appointments with him and were cooperative and listened to him when he tried to educate them about the effects of sexual abuse. However, he testified he has seen no progress in them toward admitting the truth about the sexual abuse. Both Donald and Caren maintain no sexual

abuse occurred. Hocking believed it did occur, and he testified until Donald and Caren acknowledged responsibility for these actions, no progress and treatment could be made.

Jerome Pine testified he was a rabbi for 25 years, has a Ph.D. in counseling psychology and has been in the family therapy practice for approximately five years. He has been Donald and Caren's counselor for 3½ years and the primary issue of this counseling was interpersonal relationships. Pine explained Caren has a dependency relationship with Donald and it was his goal to move that relationship toward equality. Finally, Pine testified the issue of sexual abuse came up during the course of counseling but both Donald and Caren steadfastly maintained their innocence. Inasmuch as they both continued to deny the abuse occurred, Pine felt this area was a nonissue and did not deal with it. However, Pine did acknowledge progress and growth in Donald and Caren's relationship.

The last three witnesses to testify were the caseworkers assigned to this family by DCFS. Carolyn Wayne worked with this family from September 1985 through August 1987 and again in June 1988 through March 1989. She testified her job duties included creating a client-service plan for the family which set forth the goals to be reached and the necessary steps toward achieving these goals. Although there have been four client-service plans prepared for this family, Wayne testified five basic goals have been included in each plan. These basic goals are (1) maintaining a clean, healthy home environment, (2) working cooperatively with the homemaker in order to develop housekeeping and parenting skills, (3) participation in counseling designed to deal with the issue of sexual abuse, (4) regular visitation with the children, and (5) assumption of responsibility to meet nutritional needs of the children. Wayne testified the only goal consistently met by Donald and Caren while she was their caseworker was the regular visitation with the children. She testified that occasionally Caren showed signs of achieving improved homemaker and parenting skills but she was inconsistent in maintaining those skills. Wayne testified she referred Donald and Caren to a sexual abuse counseling program but they only attended one session and refused to return. Wayne also testified that Caren did not prepare adequate meals for the children and the counseling they were seeking was only for marital problems. Wayne concluded Donald and Caren unsatisfactorily completed all of the goals established by the client-service plans except for the regular visitation with the children.

Robbie Gephart testified she was the caseworker assigned to this family from August 1987 through June 1988. Gephart testified the main goal she established for Donald and Caren was to acknowledge the sexual abuse and to address the issue of the impact on the children. Other goals included the maintenance of a clean home, the development of better parenting skills, and the knowledge necessary to prepare nutritional meals for the children as well as regular visitation with the children. Gephart testified the only goal achieved by Donald and Caren was the regular visitation with the children. She testified on numerous occasions she saw the house in a filthy condition in that there were dirty dishes with moldy food throughout the house, clothing all over the living room floor, and enough debris on the floor to cause her feet to stick when she walked through the kitchen. She also testified about half the time she tried to enter the house, Caren refused to let her in, giving weak excuses for this refusal. Gephart stated Donald and Caren told her they were receiving marriage counseling but no counseling for the sexual abuse.

The final witness for the State was the present caseworker, Terry Current. She stated she has been assigned to this family since March 1989. Current testified the objectives established in the client-service plans she developed included regular visitation with the children, sexual abuse counseling for Donald, cooperation with the homemaker to develop better parenting skills, and the proper activities to engage in during visits with the children. Current testified Donald and Caren maintained regular contact with the children and activities during these visits were appropriate. At first, Current testified, Caren would use these visits to provoke guilty feelings in the children for their failure to call her but after Current spoke with Caren about this unacceptable behavior, Caren ceased speaking in this manner to the children. Current testified Donald and Caren appeared to have a good relationship with the homemaker but she was unsure whether they really were learning better parenting skills from the homemaker or simply mimicking her to give the appearance of progress. Finally, the real problem existed in the lack of sexual abuse counseling. Current testified Caren either refuses to discuss the issue or denies any abuse occurred. Current further testified Donald still denies any abuse occurred, and in her opinion, until Donald admits there is a problem, the children will always be in a risk of harm situation.

Donald Hobbs testified on his own behalf. Donald stated he and his wife were never told that utilizing Jerome Pine as a counselor

was inadequate nor were they ever told that if they failed to complete all of the goals of the client-service plans, their parental rights would be terminated. On cross-examination, Donald admitted he had not discussed the issue of sexual abuse with Pine nor has Pine offered any counseling on that subject. Also on cross-examination, Donald testified he would not admit to the sexual abuse and seek counseling if he were told he would lose his parental rights, because he had never sexually abused his children.

The trial court found Donald and Caren unfit for failing to make reasonable efforts to correct the conditions which were the basis for the removal of the children and for failing to make reasonable progress toward the return of the children. A dispositional hearing was held at which Donald and Caren's parental rights were terminated. At the dispositional hearing, Caren testified she felt it was wrong to have her children taken away and she believed her children wanted to return home. Terry Current testified in her opinion it would be in the best interests of A.H., T.H., and M.H. that all of Donald and Caren's parental rights be terminated. The trial court found it was in the best interests of the children to terminate the parental rights of Donald and Caren. The court stated it was time to give these children a fresh start, and an opportunity to get into a household hopefully where they could be adopted together and resume a normal family life.

■■ Initially, we must address the State's argument that this appeal should be dismissed because respondents' brief fails to comply with Supreme Court Rule 341(e). (134 Ill. 2d R. 341(e).) Reviewing courts may dismiss an appeal where the appellant's brief fails to comply with supreme court rules applicable to briefs. (*47th & State Currency Exchange, Inc. v. B. Coleman Corp.* (1977), 56 Ill. App. 3d 229, 371 N.E.2d 294.) Since Rule 341 is an admonishment to the parties, and not a limitation upon this court's jurisdiction, this court may nevertheless consider the merits of a party's appeal. *Wilson v. Illinois Benedictine College* (1983), 112 Ill. App. 3d 932, 445 N.E.2d 901.

■■ Respondents' brief fails to articulate an organized or cohesive legal argument for us to consider. It is not in compliance with Supreme Court Rule 341. This brief cites to pages of the record inaccurately, contains a rambling and incoherent statement of facts and, although four cases are listed under the heading "Points and Authorities," these cases are not referred to or explained in the argument section of the brief. We note that respondents are appealing *pro se*, but admonish them that courts will not apply a more lenient

standard to them because of this *pro se* status. (*Harvey v. Carponelli* (1983), 117 Ill. App. 3d 448, 451, 453 N.E.2d 820, 823.) Nevertheless, because of the serious nature of these proceedings, we will address the merits of the case. Our courts have recognized parental rights and responsibilities are of deep human importance, and thus, will not be lightly terminated. (*In re A.T.* (1990), 197 Ill. App. 3d 821, 555 N.E.2d 402.) We assume, as did the State in its brief, that respondents contend the trial court's decision terminating their parental rights was contrary to the manifest weight of the evidence. However, we disagree and affirm the trial court.

■ A finding of unfitness as the basis for termination of parental rights must be supported by clear and convincing evidence, but will not be disturbed by the reviewing court unless against the manifest weight of the evidence. (*In re K.S.* (1990), 203 Ill. App. 3d 586, 560 N.E.2d 1380.) Great deference is given to the findings of the trial court since the judge had the opportunity to view the witnesses and evaluate the testimony. *In re C.P.* (1989), 191 Ill. App. 3d 237, 547 N.E.2d 604.

■ In order for respondents to make "reasonable progress" toward the return of a child, they must make a minimum measurable or demonstrable movement toward that goal. (*In re Boolman* (1986), 141 Ill. App. 3d 508, 491 N.E.2d 1.) Whether a small amount of progress is reasonable must be determined with proper regard for the best interests of the child. (*In re Edmonds* (1980), 85 Ill. App. 3d 229, 406 N.E.2d 231.) The question of what is a reasonable effort involves a subjective judgment based upon the amount of effort which is reasonable for a particular person, while the question of what is reasonable progress is more objective, depending upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. (*In re Doolan* (1981), 101 Ill. App. 3d 322, 427 N.E.2d 1348.) The benchmark for determining reasonable progress is the situation which triggered the child's initial removal. *In re Bennett* (1980), 80 Ill. App. 3d 207, 212, 399 N.E.2d 735, 738.

■ A determination of reasonableness might well involve considerations of the limitations of the parents, but also would necessarily require consideration of the possibility that the child might be forced to indefinitely reside with the succession of impermanent foster parents. (*In re Austin* (1978), 61 Ill. App. 3d 344, 350, 378 N.E.2d 538, 543.) Courts must not allow the child to live indefinitely with a lack of permanence inherent in a foster home. (*C.P.*, 191 Ill. App. 3d at 243, 547 N.E.2d at 607.) Once the court finds

the parents are unfit, as did the court here, the court can, in determining whether to terminate their parental rights, consider the best interests of the minor. All of the parental rights must yield to the best interests of the child. *In re I.D.* (1990), 205 Ill. App. 3d 543, 552, 563 N.E.2d 1200, 1206.

■ The trial court's finding of unfitness and termination of parental rights was not contrary to the manifest weight of the evidence. The evidence clearly and convincingly established respondents failed to make reasonable progress toward the return of the children within 12 months of their being adjudicated neglected and abused minors, and failed to make reasonable efforts to correct the conditions which were the basis for the removal of the children.

The most compelling evidence is the persistent denial of sexual abuse by both Donald and Caren. Both parents refused to acknowledge any sexual abuse occurred and refused to even discuss the matter with their counselors. Hocking testified that the first step toward dealing with sexual abuse is for the abuser to assume responsibility for his actions. Without that admission, any treatment would be unsuccessful and no progress can be made. A primary goal of all the client-service plans was for respondents to assume responsibility for the sexual abuse and to seek counseling regarding that abuse. Clearly, the refusal to accept that the abuse occurred and the refusal to discuss the matter with their counselor cannot be characterized as reasonable. The sexual abuse of T.H. and M.H. was the condition causing the removal of the children in 1985 and 1988. Donald and Caren have not made any efforts, reasonable or otherwise, to correct this condition. Moreover, the evidence established respondents failed to meet the other goals of the client-service plans. One such goal was for Caren to maintain a clean and healthy home. Robbie Gephart testified she viewed the home between August 1987 and June 1988 and frequently found it in a hazardous, unhealthy condition. Gephart also testified she was denied access to the house approximately half of the time she attempted to check on the condition of the house. The present caseworker, Terry Current, testified that although respondents appeared to have a decent relationship with the homemaker assigned to help them, she had serious doubts whether they believed in the parenting skills being taught or whether they were simply mimicking her in order to satisfy DCFS.

The only goal respondents met was the regular visitation with the children. All of the caseworkers testified respondents kept these appointments with the children or had valid excuses for missing the appointments. However, the quality of these meetings was quite

poor. Respondents told the children they would be allowed to return home if they did certain things to appease DCFS. Furthermore, respondents refused to talk about the sexual abuse with their children and, when the children asked about other relatives Donald was accused of abusing, they were told not to mention those names again.

Neither T.H. nor M.H. expressed a desire to return home. A.H. stated he would like to return home but also would like to be adopted with his sisters. All three children have adapted well to foster homes. A.H. refers to another child in his foster home as his little brother. T.H. and M.H. have gained weight since going to their foster home and all three children do exceptionally well in school. All three children have been in therapy for approximately 10 months. Their therapist, Lee Scherzinger, reported T.H. and A.H. are at a standstill in their therapy because of their father's continual denial of the abuse. Scherzinger reported M.H. has only received supportive therapy as she has less outward signs of distress from being in foster care than do the other two children. Finally, Scherzinger recommended the children not be returned to their parents because of the parents' lack of motivation to work honestly and expediently to restore the trust of their children and to become a family once again.

This court has previously noted that, although parents visit their children, the refusal to face their shortcomings is a sufficient basis for a trial court to conclude that they have not made "reasonable progress" toward the return of the child. (See *Boolman*, 141 Ill. App. 3d at 512, 491 N.E.2d at 3; *C.P.*, 191 Ill. App. 3d at 244, 547 N.E.2d at 608.) Respondents' visitations with their children do not enable them to meet the "reasonable progress" standard when they have failed to make progress in other areas, such as acknowledging the sexual abuse, seeking counseling to alleviate the effect of that abuse, and maintaining a clean and healthy home.

For the foregoing reasons, the decision of the trial court is affirmed.

Affirmed.

STEIGMANN and KNECHT, JJ., concur.