*In re* B.S. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Rhonda S., Respondent-Appellant).

First District (3rd Division)   No. 1—98—3855

Opinion filed November 8, 2000.

652

Rita A. Fry, Public Defender, of Chicago (Ronald P. Alwin, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Nancy Grauer Kisicki, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

In this case portions of Rhonda S.'s difficult life were recreated in a courtroom through testimony and documents. When the hearing ended, the trial court found her to be an unfit parent and terminated her parental rights to Bradley S. (born May 9, 1988), Randall S. (born June 15, 1989), and Briana S. (born August 25, 1992). Then the trial court appointed a guardian with the power to consent to adoption of the three children. Rhonda S. appeals those orders. We affirm.

## FACTS

The record shows that Rhonda began using marijuana in 1981, when she was 21 years old. Shortly after, Rhonda had her first psychotic break. Rhonda was hospitalized and diagnosed a schizophrenic. Her drug usage, according to doctors, precipitated and/or exacerbated Rhonda's mental condition.

Since 1981, constants in Rhonda's life have been illegal drug use and psychotic episodes. A psychiatric evaluation completed by Forensic Clinical Services and dated December 12, 1996, tells us that by 1986 Rhonda had been hospitalized privately twice and in a state facility (Tinley Park Mental Health Center) three times. A comprehensive psychiatric evaluation by MacFarland Mental Health Center, dated July 12, 1989, states: "[T]his is the third MacFarland hospitalization for [Rhonda]." In every case, hospitalization has come after Rhonda stopped taking her prescribed medication but continued regular use of marijuana and other drugs, ignoring repeated doctors' warnings that marijuana exacerbates her mental illness.

In May 1988, Rhonda became involved with the Department of Children and Family Services (DCFS) after the birth of her first son, Bradley. During her pregnancy, Rhonda stopped taking her prescribed medications. Rhonda then began experiencing hallucinations. After Bradley's birth, Rhonda voluntarily placed him in temporary foster care while she was hospitalized. On June 21, 1988, Bradley was made a ward of the court, but Rhonda was allowed to retain custody of Bradley. He was returned to her after her release from the hospital. DCFS, however, remained in close contact with Rhonda. Besides having home visits from her caseworker, Rhonda received homemaker services three times each week so she could learn how to care for Bradley. Rhonda also received regular visits from her mental health worker.

On June 15, 1989, Rhonda gave birth to her second son, Randall. Again, Rhonda discontinued her medications during her pregnancy and, as a result, suffered acute schizophrenic symptoms. She voluntarily placed both of her children in foster care while she was rehospitalized.

On July 6, 1989, Rhonda left the hospital. She insisted on leaving, though she still was having delusions. Four days later, she went to the emergency room and was admitted to MacFarland on July 11, 1989. She stayed at MacFarland until September 28, 1989. During this stay, Rhonda told the doctors she had been using marijuana regularly since the age of 23. Just prior to her admission to the hospital in July 1989, she said, she had been smoking marijuana daily, several times throughout the day.

On October 26, 1989, Bradley and Randall were adjudged dependent. Because Rhonda did not have the capacity to care for two children, only Randall was returned to her custody. In just seven weeks, however—on December 15—Randall was returned to foster care because Rhonda was unable to meet the infant's needs. On December 28, 1989, both Bradley and Randall were adjudicated wards of the court and placed in DCFS' custody and guardianship.

In 1990, Rhonda appeared to be making progress toward the return of her children until October 1990, when she relapsed into schizophrenia and began experiencing hallucinations. She required hospitalization through November and December 1990. Once again, Rhonda told doctors about her regular and excessive use of marijuana.

After her release from the hospital in December, Rhonda's overall compliance with DCFS improved. She cooperated with her mental health professionals, began taking her medication regularly, and participated in parenting classes. Due to Rhonda's progress, visitations with her two boys were increased over the first five months of 1991. Rhonda appeared ready to have her children back. Bradley then was returned to Rhonda's custody on June 8, 1991, and Randall was returned to Rhonda's custody on September 28, 1991. Later, DCFS guardianship of the boys was vacated.

In 1991, Rhonda became pregnant for the third time. On August 25, 1992, she gave birth to Briana. Briana's father is Tyrone James, a drug abuser and suspected drug dealer.[1] In an intake fact sheet for Haymarket, dated July 14, 1995, Rhonda reported she began using crack cocaine in 1991. In that fact sheet she rated cocaine as her number one drug of choice, followed by marijuana. We note, however, in a substance abuse assessment dated August 1989, Rhonda reported she had used cocaine, at the urging of a boyfriend, on three occasions in 1985, when she was 25 years old.

On September 6, 1992, shortly after Briana's birth, Rhonda placed all three children in foster care. She then voluntarily signed herself into the hospital because she was experiencing schizophrenic symptoms.

On October 7, 1992, DCFS filed petitions alleging Bradley S., Randall S., and Briana S. were dependent minors pursuant to section 2—4 of the Juvenile Court Act of 1987 (705 ILCS 405/2—4 (West 1992)), because their mother could not provide them proper care due to her mental disability.

Rhonda left the hospital against her doctor's recommendation on October 23, 1992. She did not ask to have the children returned to her. She told her DCFS worker she "wasn't ready" and might not be "ready" for six months or more.

On November 24, 1992, all three children were adjudged dependent and, on December 23, all three children were adjudicated wards of the court and placed in the custody and guardianship of DCFS.

Rhonda reentered the MacFarland Mental Health facility on Janu-

---

[1]Mr. James' parental rights also were terminated by the court on September 10, 1998, but that determination is not being appealed.

ary 19, 1993. She refused to take medications while at the hospital and signed herself out on January 27, 1993, even though she was still experiencing hallucinations. A discharge summary prepared by MacFarland Mental Health Center states: "[Rhonda] will need to continue to work with DCFS in regards to her children. She is not capable at this time of caring for her children. In fact, she will have a big enough chore to manage care of her own self."

After leaving the hospital in January 1993, Rhonda began living with a man she met at a bus stop. Rhonda allowed her apartment to be used as a brothel and prostituted herself to obtain money for cocaine and marijuana.

In July 1993, Rhonda regained custody of her two older children based on the recommendation of Rhonda's psychiatrist, Dr. Sarma. The boys remained with Rhonda only four months—until November 1993—when they were returned to the custody of DCFS because Rhonda admitted hitting Randall with a belt, leaving bruises.

After November 1993, Rhonda did little to demonstrate to DCFS an improvement in her ability to provide appropriate care for the children. Though Rhonda saw her therapist and took her medications for a few months, while she stayed with her father in Chicago from November 1993 through April 1994, by May 1994 she returned to her former way of life. She moved out of her father's home, started using cocaine again, and prostituted herself for money.

In August 1994, Rhonda had to be admitted to Jackson Park Hospital because she was experiencing paranoid delusions. She stayed there four weeks. She then transferred to Lydia Health Care Center, where she stayed until April 1995. In April 1995, Rhonda became extremely ill. She was hospitalized at Our Lady of the Resurrection Hospital from April 6 through 14, 1995, in a diabetic coma.

After leaving this hospital, Rhonda was unable to maintain any permanent residence—she shifted between stays with her sister, her father, at shelters, at recovery centers, or at motels. In July 1995, she stayed for one week at the Haymarket recovery center. She told Haymarket staff she smoked marijuana three times per day and used cocaine four times per month.

After Haymarket, Rhonda was admitted to Jackson Park Hospital for two days and then was released to a Catholic Charities shelter where she stayed for two to three weeks. In August 1995, Rhonda returned to Springfield, even though her children were in foster care in Chicago. On September 15, 1995, Rhonda was admitted to MacFarland Mental Health Center. The admission report states:

> "While [Rhonda] is very sincere, she lacks awareness of the chaotic and destructive pattern of living since her last discharge in Janu-

ary 1993 *** [and] her actions and circumstances do not suggest that getting her kids back is likely in the near future."

Rhonda was released from MacFarland on December 1, 1995, but was readmitted later in the month and stayed until February 1996. After leaving MacFarland, Rhonda first lived with her mother, then in section 8 housing, then with Tyrone James.

As part of her service plan, Rhonda was to make monthly urine drops. In May 1996, Rhonda tested positive for cocaine and cannabis. She failed to show up for her monthly urine drops in June and July. She later admitted using drugs while living with Tyrone from April to August 1996.

On April 1, 1996, DCFS filed supplemental petitions on behalf of Rhonda's three children, for the appointment of a guardian with the right to consent to adoption. In the petitions it was alleged Rhonda was "unfit," as that term is defined in section 1(D) of the Adoption Act. 750 ILCS 50/1(D) (West 1996). Specifically, it was alleged Rhonda: (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare; (2) was a habitual drunkard or addicted to drugs, other than those prescribed by a physician, for at least one year immediately prior to the commencement of the unfitness proceedings; (3) failed to make reasonable efforts to correct conditions that were the basis for the removal of the children and/or failed to make reasonable progress toward the return of the children, within 12 months after the children were adjudicated dependent; and (4) was unable to discharge her parental responsibilities due to mental impairment, mental illness, mental retardation, or other developmental disability, and there was sufficient justification to believe that the inability would extend beyond a reasonable time period. 750 ILCS 50/1(D)(b), (D)(k), (D)(m), (D)(p) (West 1996).

Rhonda reentered MacFarland on August 26, 1996, experiencing paranoid delusions. She reported she had stopped her medications and said she was upset because she ended her relationship with her boyfriend. When she was admitted, Rhonda reported she had used crack cocaine and marijuana, but claimed she last used drugs about six months before. Later, however, in a progress note dated August 29, 1996, Rhonda admitted using alcohol and marijuana on a daily basis prior to her admission. She also admitting using crack cocaine in June 1996. A toxicology report verified Rhonda's recent use of marijuana. Her chronic use of alcohol and marijuana and "sporadic" use of cocaine were noted again in a psychological assessment dated September 5, 1996.

Rhonda stayed at MacFarland through November 1996. The exact date of her release is not known. We do know, however, she and Ty-

rone had a visit with the children on December 11, 1996—the first in four months.

Rhonda had a good visit with the children in March 1997, but during the April 1997 visit, she was acting in a paranoid delusional manner. She was hospitalized a few days later. Again, she admitted she had stopped taking her medications.

Rhonda saw her children only three times between May 1997 and May 1998. Her DCFS client reviews show that during this time Rhonda was exhibiting the same lifestyle patterns—she had no permanent housing, failed to participate in outpatient activities aimed at stabilizing her on medication, and failed to participate in counseling.

A fitness hearing was held on September 10, 1998. After the hearing, the court ruled Rhonda an unfit parent under sections 1(D)(k), (D)(m), and (D)(p), but not under section 1(D)(b). Immediately following this ruling, the court heard additional evidence and determined it was in the best interest of Rhonda's three children to terminate her parental rights and to appoint a guardian with the right to consent to their adoption. Rhonda now appeals the trial court's determinations of unfitness and the court's decision to terminate her parental rights.

## DECISION

Rhonda contends the trial court's findings that she is an unfit parent pursuant to sections 1(D)(k), (D)(m) and (D)(p) of the Adoption Act are not supported by clear and convincing evidence. See 705 ILCS 405/2—29(4) (West 1996) ("A finding of the unfitness of a parent must be made in compliance with the Adoption Act and be based upon clear and convincing evidence"). A correct finding under any one of the statutory provisions is enough to support the order declaring Rhonda an unfit parent. We conclude the trial court did not err when it found she was unfit under the three separate provisions.

■ On review, a trial court's finding as to fitness is to be afforded great deference and should be reversed only when the trial court's ruling is shown to be against the manifest weight of the evidence. *In re Latifah P.*, 315 Ill. App. 3d 1122 (2000); *In re A.S.B.*, 293 Ill. App. 3d 836, 843, 688 N.E.2d 1215 (1997). A decision regarding parental fitness is against the manifest weight of the evidence where the opposite result is clearly the proper result. *In re T.B.*, 215 Ill. App. 3d 1059, 1062, 574 N.E.2d 893 (1991). If there is sufficient evidence to support a finding of unfitness on any one statutory ground, a finding of unfitness will be upheld. *In re M.M.*, 303 Ill. App. 3d 559, 567, 709 N.E.2d 259 (1999).

## Section 1(D)(m)

■ Section 1(D)(m) requires a parent, "within 12 months after an

adjudication of neglected minor, abused minor or dependent minor under the Juvenile Court Act": (1) to "make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent," or (2) to "make reasonable progress toward the return of the child to the parent." 750 ILCS 50/1(D)(m) (West 1996). Failure to make advancements in either of these two separate and distinct areas is grounds for finding a parent unfit. *In re J.A.*, 316 Ill. App. 3d 553 (2000); *In re C.M.*, 305 Ill. App. 3d 154, 711 N.E.2d 809 (1999).

■ When deciding whether "reasonable effort" has been made, a court must take a subjective look at the achievements of the parent whose rights are at stake and determine whether that parent has made earnest and conscientious strides toward correcting the conditions that led to the loss of custody. *In re C.M.*, 305 Ill. App. 3d at 163-64. "Parental deficiencies collateral to the conditions that were the basis for the child's [adjudication], even if serious enough to prevent the return of the child, are outside the scope of this inquiry and are therefore not relevant." *In re C.M.*, 305 Ill. App. 3d at 164.

■ "Reasonable progress," on the other hand, is an objective review of the steps the parent has taken toward the goal of reunification. *In re C.M.*, 305 Ill. App. 3d at 164. For a parent to make "reasonable progress" toward the return of a child, he or she must make " 'a minimum measurable or demonstrable movement toward that goal.' " *In re Sheltanya S.*, 309 Ill. App. 3d 941, 953-54, 723 N.E.2d 744 (1999), quoting *In re Boolman*, 141 Ill. App. 3d 508, 511-12, 491 N.E.2d 1 (1986).

■ When considering whether a parent is unfit under section 1(D)(m) of the Adoption Act, the "relevant period of time *** in which the parent's efforts or progress must be assessed and measured[ ] is the 12-month period following the adjudication" of neglect, abuse, or dependency. *In re D.L.*, 191 Ill. 2d 1, 10, 727 N.E.2d 990 (2000). See also *In re K.B.*, 314 Ill. App. 3d 739, 750, 732 N.E.2d 1198 (2000); *In re J.A.*, 316 Ill. App. 3d at 564.

In accord with the holding in *In re D.L.*, we have limited our consideration of Rhonda's conduct to the 12-month period following the adjudication of dependency, *i.e.*, from November 24, 1992, to November 24, 1993. Rhonda contends the record, during this time period, does not support a finding that she failed to make reasonable efforts to correct conditions which led to the removal of her children or that she failed to make reasonable progress toward their return. We disagree.

The record shows that on October 23, 1992, one month before the time the children were adjudicated dependent, Rhonda left the hospital

against her doctor's recommendation. After she left MacFarland in October 1992 until her readmission in January 1993, Rhonda had persistent hallucinations, largely because she refused medications and failed to follow her doctor's recommendations.

When Rhonda left MacFarland later in January 1993, Rhonda did not use the next months to correct the circumstances that led to the removal of the children or prepare for their return. An intake report from MacFarland Mental Health Center dated September 15, 1995, chronicles Rhonda's behavior. It reports that from January 19 through 27, 1993, Rhonda was hospitalized at MacFarland. After her release Rhonda lived by herself in an apartment. She used cocaine regularly and allowed her apartment to be used as a brothel in exchange for money to pay for cocaine and marijuana. Rhonda also prostituted herself during this time for additional cash. In September 1993, Rhonda moved from Springfield to her father's home in Chicago. Rhonda said when she arrived in Chicago she "was in pretty bad shape" because she had stopped taking her medications. In November 1993, the boys were taken away from Rhonda because she hit Randall with a belt, leaving bruises.

DCFS case notes provide a more detailed picture:

> On November 23, 1992, one day before the dispositional hearing on the three children, Rhonda asked to have visitation with her children decreased from three hours' unsupervised visits to one-hour partially supervised visits because three hours was too much stress on her.

> December 1992—Rhonda hit Randall during visitation.

> January 1993—During a visit with her children early in the month, Rhonda displayed schizophrenic symptoms (laughing inappropriately, having a poor appearance, her house was in disarray). Rhonda entered MacFarland on January 19, 1993, but signed herself out on January 27, though she was still experiencing hallucinations. On January 28, Rhonda told her DCFS worker a man she met at the bus stop (Jeff) moved into her apartment with her.

> April 1993—Jeff moved out of Rhonda's apartment. Rhonda asked to have the children returned to her because she was lonely without Jeff. Rhonda also told the worker her public aid check had been cut, putting her in a "financial bind." Rhonda's mental health worker suggested Rhonda only wanted the children back for the extra money.

> May 1993—Dr. Sarma, Rhonda's psychiatrist, believed Rhonda was ready to have the two boys, but not Briana, returned to her custody. Visitation was increased, including some overnight visits.

> June 1993—Rhonda canceled visitation with the children, saying she had an "emergency." The "emergency" turned out to be a trip to Chicago.

July 1993—The two boys were returned to Rhonda. Within two weeks, Rhonda was showing signs of stress.

A DCFS worker reprimanded Rhonda for allowing people Rhonda didn't know to stay in the apartment (in exchange for cigarettes).

August 1993—Rhonda didn't have enough money to pay the electricity bill.

In sum, Rhonda's conduct between November 1992 and November 1993 does not show consistent effort to improve the conditions that led to the removal of the children. The finding of dependency was based on Rhonda's mental illness. To a large degree, Rhonda's mental illness is controllable. Rhonda's medical records contain the repeated observation that Rhonda is capable of functioning quite normally when stabilized on her prescribed medications. It is clear, however, that Rhonda has been unwilling to commit herself to staying on her prescribed medication and staying off illegal drugs. Her failure to do these two things is what causes her to have recurring schizophrenic episodes and paranoid delusions. Consequently, she has remained unable to care for her children.

We also cannot say that, during the relevant time period, the record provides demonstrable evidence of Rhonda's progress toward reunification with her children. Between January and September 1993, Rhonda allowed her apartment to be used as a brothel and prostituted herself for the purpose of obtaining money to pay for her drug habit. These are not the actions of a person trying to be reunited with her children.

Though Rhonda regained custody of her two sons in July 1993, the experiment failed. Rhonda was unable to maintain a stable environment for them. She jeopardized her children's welfare by allowing strangers to stay in her home in exchange for cigarettes. She could not pay her bills, had to give up her apartment, and moved to Chicago to live with relatives. Just before moving to Chicago in September 1993, she stopped taking her medicine and was "in bad shape." When she moved to Chicago, she left 13-month-old Briana in foster care in Springfield.

Even after moving in with relatives, the stress of managing two small boys was soon manifest—Rhonda disciplined Randall by hitting him with a belt, leaving bruises. In less than four months, Rhonda lost custody of the boys again. At no time has Rhonda been able to take custody of Briana.

The evidence persuades us Rhonda has little insight into her own needs. Her motivation in life is self-gratification. Even when Rhonda voices a desire to have her children returned to her, it is often for the wrong reasons—because she is lonely or needs additional income.

Rhonda has consistently shown an unwillingness to take the steps necessary to insure her own stability and, thereby, provide a safe and nurturing home for her children.

■ Having considered Rhonda's conduct during the relevant 12-month period, we conclude the trial court's determination of Rhonda's unfitness under both parts of section 1(D)(m) is not against the manifest weight of the evidence. Our conclusion is not altered by the fact that the trial court used a slightly different time period—the 12-month period following December 23, 1992—the date the children were adjudicated wards of the court. Since nothing of critical importance occurred between November 24 and December 23, 1993, the trial court could not have relied on events after November 24, 1993, for its finding . The trial court's minor deviation from the relevant time period is of little significance.

### Section 1(D)(k)

■ Under section 1(D)(k), a parent may be found unfit if the evidence shows the parent to be a "[h]abitual drunk[ard] or addict[ed] to drugs, other than those prescribed by a physician, for at least one year immediately prior to the commencement of the unfitness proceeding." 750 ILCS 50/1(D)(k) (West 1996).

Though there has been some confusion about when a fitness proceeding commences for the purposes of this statute, this question was recently resolved in *In re Latifah P.*, 315 Ill. App. 3d 1122 (2000). The court in *In re Latifah P.* concluded a fitness hearing commences with the State's filing of its supplemental petition for the termination of a parent's rights.

■ In the present case, then, the trial court's finding that Rhonda was unfit will be upheld if the record provides clear and convincing evidence that Rhonda was a habitual drunkard or abuser of drugs for at least one year immediately prior to April 1, 1996, the date on which the State filed the supplemental petitions to appoint a guardian with the right to consent to adoption. We find the record before us overwhelmingly supports the trial court's finding of unfitness due to Rhonda's persistent addiction to marijuana and cocaine.

We adopt the view of the court in *In re D.M.*, 298 Ill. App. 3d 574, 580, 699 N.E.2d 212 (1998):

> "[W]e interpret 'addiction to drugs' under section 1(D)(k) as the inability or unwillingness to refrain from the use of drugs because frequent indulgence has instilled in the person an habitual craving which is manifested in an ongoing pattern of drug use. As with habitual drunkenness, we find that evidence of indulgence without intermission is not necessary to prove drug addiction [citations] and the fact that one may voluntarily abstain for short periods of

time will not preclude a finding of drug addiction [citation]. It is sufficient to show that a person has demonstrated an inability to successfully gain control over his or her habitual craving to use the drug."

In this case, there can be no doubt that Rhonda had a long-standing addiction to drugs which did not abate in the year prior to April 1, 1996, when the supplemental petitions were filed. Except for times when she has been a patient in a mental hospital or recovery facility, Rhonda has been a constant abuser of marijuana since 1981. Rhonda has consistently ignored warnings that marijuana exacerbates her mental condition. The reason for this self-destructive behavior is self-gratification—Rhonda reported in 1990 that "cannabis allows her pleasure like nothing else."

In 1993, in addition to smoking marijuana three times a day, every day, Rhonda began using crack cocaine regularly. She was willing to do anything to support her addiction—allowed her apartment to be used as a brothel, sold her own body. After a brief hiatus, while she had custody of her two boys and stayed with her father in Chicago, Rhonda returned to prostitution to gain access to crack cocaine and marijuana. This lifestyle soon landed her back in the hospital.

From August 1994 until April 1995, Rhonda was a patient at Jackson Park and then Lydia Health Care recovery center. But as soon as she was back on the streets, Rhonda took up her addictions. When she entered Haymarket in July 1995, she admitted she had been smoking marijuana three times a day and using cocaine four times each month. At this point, Rhonda claimed cocaine as her drug of choice.

Rhonda was in and out of facilities during 1995 and 1996, but sometime after leaving MacFarland in February 1996, Rhonda began living with Tyrone James. It is no surprise, then, that her monthly urine drop in May 1996 tested positive for both cannabis and cocaine.

The evidence clearly supports the finding that Rhonda's addiction to drugs began long before April 1, 1995, and continued through April 1, 1996, and beyond. The addiction was long-standing and well-established. There were no signs of abatement. The finding of unfitness due to addictions to drugs is supported by an abundance of clear and convincing evidence.

### Section 1(D)(p)

■ Section 1(D)(p) provides that a parent will be found unfit if there is competent evidence from a psychiatrist, licensed social worker, or clinical psychologist that the parent is unable to discharge his or her parental responsibilities due to mental impairment, mental illness, mental retardation or developmental disability and "there is sufficient justification to believe that the inability *** shall extend beyond a reasonable time period." 750 ILCS 50/1(D)(p) (West 1996).

■ Rhonda does not, and could not, contend there is insufficient competent evidence to show she suffers from a mental illness which precludes her from caring for her children, or that this condition has persisted since 1981 and is likely to continue for a long time in the future. Instead, she raises a claim not presented in the trial court— that section 1(D)(p) is unconstitutional. Rhonda contends statutory provision 1(D)(p) is so vague it violates procedural and substantive due process. She also claims the provision violates equal protection because it discriminates against persons suffering from mental or developmental impairments without any rational basis.

Rhonda provides no argument or analysis to assist us in our resolution of her constitutional claims. Instead, she merely advises us of a case currently before our Illinois Supreme Court in which these constitutional claims have been successfully advanced before a trial judge. See *In re R.C.*, 195 Ill. 2d 291 (2001).

Assuming Rhonda has not forfeited the right to have us consider this claim—she failed to raise it in the trial court and failed to present any argument on appeal (*In re I.D.*, 205 Ill. App. 3d 543, 548, 563 N.E.2d 1200 (1990) (there is a strong presumption that legislative enactments are constitutional, anyone who asserts otherwise must clearly establish the constitutional violation))—we will address the question of the constitutionality of section 1(D)(p).

Biological parents have a fundamental liberty interest in the custody of their children protected under the fourteenth amendment. *In re Enis*, 121 Ill. 2d 124, 128-29, 520 N.E.2d 362 (1988); *Regenold v. Baby Fold, Inc.*, 68 Ill. 2d 419, 438, 369 N.E.2d 858 (1977). At the same time, " '[t]he State as *parens patriae* has a right and duty, as well as the authority, to legislate for the protection and welfare of children within its jurisdiction.' " *In re J.S.*, 213 Ill. App. 3d 126, 131, 571 N.E.2d 507 (1991), quoting *I.D.*, 205 Ill. App. 3d at 549. Balancing these two concerns, courts have held legislatures must not take any "action which is arbitrary or without reasonable relation to some purpose within the competency of the State to enact." *I.D.*, 205 Ill. App. 3d at 549, citing *Regenold v. Baby Fold, Inc.*, 68 Ill. 2d at 436-37.

We conclude, then, as the court did in *I.D.*, that equal protection and due process challenges to section 1(D)(p) should be subject to a rational basis test.[2] That is, "a statute will be upheld in the face of a due-process challenge, if it bears a rational relation to a legitimate State purpose and is neither arbitrary nor discriminatory (*Harris v. Manor Healthcare Corp.* (1986), 111 Ill. 2d 350, 368, 489 N.E.2d 1374,

---

[2]Rhonda appears to concede the rational basis test applies, although, as we noted before, she provides no analysis or argument.

1382) and, when faced with an equal protection argument, it will be upheld as long as the distinctions drawn bear some rational relationship to a legitimate State end (*Harris*, 111 Ill. 2d at 371, 489 N.E.2d at 1383)." *I.D.*, 205 Ill. App. 3d at 549.

We agree with the court in *In re J.S.*, that section 1(D)(p) is "neither vague nor inherently confusing and incapable of reasonable application." *In re J.S.*, 213 Ill. App. 3d at 131. The Adoption Act provides for the involuntary termination of a parent's rights if: (1) the natural parent is found unfit by clear and convincing evidence, and (2) it is determined that adoption will best serve the child's needs. *In re M.M.*, 156 Ill. 2d 53, 60-61, 619 N.E.2d 702 (1993).

Under section 1(D)(p) of the Act there is a two-part analysis to determine whether or not a parent is unfit due to a form of mental disability. First, one or more of a certain category of experts must present competent evidence to show the parent suffers from a mental disability which prevents the parent from discharging parental responsibilities. Second, there must be sufficient justification to believe the inability will extend beyond a reasonable time period. *In re J.A.S.*, 255 Ill. App. 3d 822, 824, 627 N.E.2d 770 (1994).

Not every parent with a psychiatric illness or condition is *per se* unfit to be a parent and to maintain custody of her children. *In re A.J.*, 269 Ill. App. 3d 824, 646 N.E.2d 1239 (1994). The Act affects only those parents "who cannot discharge their parental responsibility due to these disabilities and whose inability to do so will extend beyond a reasonable time." (Emphasis omitted.) *I.D.*, 205 Ill. App. 3d at 549.

Under these circumstances, we find, as did the courts in *I.D.* and *In re J.S.*, that section 1(D)(p) of the Adoption Act is neither arbitrary nor discriminatory and is rationally related to the State's purpose of ensuring the proper care and training for children. There is no constitutional violation.

## Termination of Parental Rights

■ The last issue raised by Rhonda is the trial court's decision to terminate her parental rights. Even if a parent has been found unfit to have custody of a child, it does not necessarily follow that the parent cannot remain the child's legal parent with attendant rights and privileges. *In re B.C.*, 247 Ill. App. 3d 803, 806, 617 N.E.2d 1207 (1993). However, once the trial court has made a finding of unfitness, all considerations must yield to the best interests of the child or children. *In re M.C.*, 197 Ill. App. 3d 802, 806, 555 N.E.2d 111 (1990). A trial court's decision to terminate an unfit parent's parental rights rests within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *In re M.S.*, 302 Ill. App. 3d 998,

1002, 706 N.E.2d 524 (1999); *In re V.O.*, 284 Ill. App. 3d 686, 691, 673 N.E.2d 439 (1996).

Rhonda contends that even if the trial court properly found her to be an unfit mother, the decision to terminate her parental rights was error because there are no prospective adoptive parents at this time.

The decision to terminate a parent's rights is based on the court's determination that freeing the children for adoption would be in the best interests of the children. Though the current availability of an adoptive home is one of the considerations when deciding whether termination of a parent's rights is in the best interests of a child, it is not the only one. It may be just as important to free children from continued involvement with a mother whose chaotic and disruptive lifestyle is a detriment to their welfare.

In September 1998, at the time of the termination hearing in this case, the three children resided together in the same foster home. Bradley, age 10, and Randall, age 9, had been in the same home since July 1994. Briana, age 6, joined them in July 1997. The children were doing well and had no special needs at that time. The DCFS worker testified she had consulted the children about their situation and they expressed a desire to stay in their present foster home. Though the foster parents did not wish to adopt the children, they were willing to keep all three children. DCFS informed the court that subsidized guardianship was being considered as an alternative to adoption, due to the age of the children, but that search for an adoptive home would continue to be explored.

The trial court concluded that here, as in many cases, there is no perfect solution. Rather, the better alternative has to be taken. In this case, the court found the better alternative was to give the children a chance for some permanency in their lives, even if that meant they were not adopted, but continued to have a secure and stable home environment with the foster family they had been with for some years.

We cannot say the trial court's decision to terminate Rhonda's parental rights under the circumstances here was an abuse of discretion.

## CONCLUSION

We affirm the trial court's findings that Rhonda S. is unfit pursuant to sections 1(D)(m), (D)(k), and (D)(p) of the Adoption Act. Also, we affirm the trial court's decision to terminate Rhonda's parental rights and appoint a guardian with the right to consent to adoption.

Affirmed.

HALL, P.J., and CERDA, J., concur.