NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 241304-U

NOS. 4-24-1304, 4-24-1305 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 31, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* K.H. and B.H., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
|       Petitioner-Appellee, | ) | Nos. 20JA91 |
|       v. | ) |     20JA92 |
| Melanie H., | ) | |
|       Respondent-Appellant). | ) | Honorable |
| | ) | Timothy J. Cusack, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Harris and Justice Vancil concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court held (1) the trial court's order finding respondent mother remained dispositionally unfit was not against the manifest weight of the evidence where she continued to reside with her husband, who was unfit, and (2) the order terminating wardship was an abuse of discretion where respondent made reasonable progress toward reunification and the children had not yet achieved permanency with their father.

¶ 2    Respondent, Melanie H., is the mother of K.H. and B.H. In 2020, the trial court removed K.H. and B.H. from respondent's custody and found respondent unfit because of domestic violence between respondent and the minors' father, Kendall H. In December 2023, the court found Kendall fit, and in April 2024, it granted Kendall custody of K.H. and B.H. In September 2024, the court ruled that respondent remained unfit, granted Kendall guardianship of K.H. and B.H., terminated the wardship, and closed the cases. Respondent appeals, arguing that the court erred in (1) finding that she remained unfit and (2) terminating the wardship. We affirm

the court's finding of unfitness but reverse its order terminating the wardship and remand for further proceedings consistent with this decision.

¶ 3                                    I. BACKGROUND

¶ 4                                A. Shelter Care Petition

¶ 5         On April 16, 2020, the State filed a shelter care petition, alleging that K.H., an 18-month-old, and B.H., a 2-month-old, were neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2020)) in that their environment was injurious to their welfare. According to the petition, on April 8, 2020, police officers were dispatched to respondent's home based on a report of a domestic dispute. At the scene, respondent told the officers that Kendall was " 'beating [her] ass.' " Respondent said Kendall pulled out a chunk of her hair and injured her. Respondent told the officers that she and Kendall "fight all the time" and that he had previously been arrested for domestic battery against her.

¶ 6         Respondent also spoke to an investigator from the Illinois Department of Children and Family Services (DCFS). Respondent told the investigator that Kendall " 'came at her,' " pushed her, grabbed her, and pulled her hair out. Kendall admitted to the investigator that he "was physical with [respondent] by pulling her hair, pushing her[,] and grabbing her."

¶ 7         The DCFS investigator discovered two prior domestic violence incidents between respondent and Kendall in May 2019 and June 2017 and Kendall's narcotics overdose in 2015. The investigator also found charges pending against Kendall for domestic battery in Tennessee and an active warrant for a probation violation in Florida. K.H. and B.H. were taken into protective custody on April 15, 2020.

¶ 8                          B. Temporary Custody Hearing and Order

¶ 9         On April 17, 2020, the trial court held a hearing and entered an agreed order,

granting temporary custody of K.H. and B.H. to DCFS, with authority to place the minors. DCFS assigned the case to the Center for Youth and Family Solutions (CYFS), with Cierra Nichols as the caseworker.

¶ 10　　　A DCFS integrated assessment was completed in August 2020. Kendall reported that he drank six to seven beers prior to the domestic violence incident on April 16, 2020. He also reported a history of heroin abuse and said he successfully completed residential treatment in April 2019 and had abstained from heroin since then.

¶ 11　　　Respondent reported no history of alcohol or drug abuse. She reported that she had been treated for depression since 2007 and anxiety and panic attacks since 2017. As of May 2020, respondent had no criminal history. Respondent reported to DCFS that she separated from Kendall so she could focus on her children.

¶ 12　　　　　　　C. Adjudicatory and Dispositional Hearing and Orders

¶ 13　　　Respondent stipulated to the allegations in the petition. On September 1, 2020, the trial court held a combined adjudicatory and dispositional hearing. The court found K.H. and B.H. were abused or neglected in that their environment was injurious to their welfare based on the contents of the petition. The court also found respondent unfit and that placement with her was contrary to the health, safety and best interests of the minors because of the "significant domestic violence history." The court granted the petition, adjudicated the minors neglected, made them wards of the court, and placed custody of the minors with DCFS, with the right to place.

¶ 14　　　The trial court ordered that respondent undergo, comply with, and successfully complete (1) a substance abuse assessment and any treatment recommended, (2) counseling, and (3) a domestic violence class. The court also ordered that respondent must submit to random drug and alcohol testing at least twice monthly.

¶ 15        The trial court ordered Kendall to complete a substance abuse assessment and any treatment recommended, attend a domestic violence class, and submit to at least two drug drops monthly. According to the DCFS family service plan, Kendall needed to "achieve and maintain an alcohol and drug free level of personal functioning." This required that he "stop the use of all mind[-]altering substances (including alcohol, non-prescribed medications, synthetic marijuana, etc.)."

¶ 16                    D. Respondent Remains Unfit

¶ 17        Nichols filed a permanency review report with the trial court in February 2021. Nichols revealed that respondent was pregnant and expected to give birth in July. Respondent was no longer in a relationship with Kendall but was in a relationship with her unborn baby's father, Kristian H. According to Nichols, respondent attended counseling and completed domestic violence services. Respondent also completed a drug and alcohol assessment, and no treatment was recommended. Respondent completed all required drug drops, which were negative for all substances.

¶ 18        The trial court held a permanency review hearing on June 8, 2021. The court determined the appropriate permanency goal was for the minors to return home within 12 months. The court found respondent had made "reasonable efforts" but not "reasonable progress" toward the children returning home because of information provided at the hearing about Kristian. The record on appeal does not contain a transcript of that hearing.

¶ 19        In August 2021, Nichols filed a report with the trial court. According to the report, respondent gave birth to a daughter, Bl. H., in July. Respondent told Nichols that she ended her relationship with Kristian after he "showed aggressive behaviors with DCFS/CYFS staff." Nichols reported that respondent "continued to engage in individual counseling and drug drops 2x a

month." However, Nichols's report showed that respondent missed four drug drops in July and August.

¶ 20 Nichols reported that Kendall was hospitalized for six weeks, beginning on May 29, 2021, due to kidney failure and heart complications. When he was admitted to the hospital, Kendall "had heroin in his system." From March to August 2021, Kendall completed 13 of 16 scheduled drops, which were negative for substances.

¶ 21 At the dispositional hearing on August 31, 2021, the trial court found respondent "unable" to care for the minors because she "needs to drop" and the court had "concerns about [respondent's] relationship with [Kristian]." The court found respondent made "mixed efforts" toward the goal of her children returning home because of her "inability to make drug testing."

¶ 22                                   E. Respondent Becomes Fit

¶ 23 On October 15, 2021, by agreement of the parties, the trial court entered an order finding respondent fit. Thereafter, on November 18, 2021, the court ordered, by agreement, that B.H. and K.H. begin transitioning home to respondent immediately.

¶ 24 In a report filed on December 1, 2021, Nichols reported as follows:

> "On November 13, 2021[, Kendall] overdosed during a parent-child visit in the foster home. [Kendall] was found on his hands and knees in the closet of the children's room with a needle in his arm. Per police report, [Kendall] had 7 syringes and 2 suspected crack pipes on him at the time."

Kendall did not complete any drug screens from September to November 2021. Kendall reportedly checked himself into a rehabilitation center on November 18, 2021.

¶ 25 On December 14, 2021, the trial court entered an order finding, "The appropriate permanency goal is remain home with mother." The court found respondent fit and that she had

- 5 -

"made reasonable efforts and progress toward return home." The court found Kendall unfit because he "overdosed on 11/13/21 during a supervised visit with [K.H. and B.H.]" On December 21, 2021, the State filed a petition to terminate Kendall's parental rights.

¶ 26 According to reports filed in March and May 2022 by Nichols and another caseworker, a hotline call to DCFS was made on January 4, 2022, reporting bruising on K.H. and B.H.'s younger sibling, Bl. H. A DCFS investigator performed a safety assessment of respondent's home and deemed it "unsafe." All three children were removed from the home. The DCFS investigation concluded that Bl. H.'s bruising was caused by "an unknown perpetrator."

¶ 27 In May 2022, Nichols reported that Kendall completed inpatient substance abuse treatment in November 2021. She further reported that Kendall failed to attend any scheduled visits with K.H. and B.H. Nichols recommended that it was in the best interest of K.H. and B.H. to terminate Kendall's parental rights.

¶ 28 F. Respondent Becomes Unfit Again

¶ 29 In June 2022, Nichols filed a report with the trial court, stating she recently discovered that respondent secretly married Kristian in November 2020. According to Nichols, respondent hid this information from her.

¶ 30 Kendall completed three out of five drug screenings in April and May 2022. All three were positive for tetrahydrocannabinol (THC), the psychoactive ingredient found in marijuana. Nichols reported that Kendall began visiting K.H. and B.H. on May 15, 2022, and stated that Kendall "does well" with them at visitation. Nichols reported that respondent's visitation had become supervised because of her "husband not completing services."

¶ 31 At the permanency review hearing on June 8, 2022, the trial court found the new permanency goal was for the minors to return home within 12 months. The court found respondent

"unable" to care for her children because she was "not honest." The court found respondent had made "reasonable efforts" but "not reasonable progress" toward the return of her children due to her dishonesty.

¶ 32    In September 2022, Nichols reported that Kendall had moved into a new apartment with his paramour, Samantha C., who "is also involved with DCFS." Kendall's drug screen on August 19, 2022, was positive for THC.

¶ 33    In a report filed with the trial court in October 2022, Nichols noted that respondent "is currently under court supervision for a DUI from 2020." Nichols stated in her report: "[Respondent] has completed all court ordered services; however, she is married to an unfit parent who has made little to no progress/efforts." Nichols reported that Kendall was attending weekly Narcotics Anonymous meetings, had completed a domestic violence course, and had not been involved in any domestic violence incidents since 2020.

¶ 34    In March 2023, Nichols filed a permanency hearing report with the trial court. In it, Nichols reported that a domestic violence incident occurred between respondent and Kristian on January 3, 2023. As a result of that incident, respondent suffered a broken nose.

¶ 35    In June 2023, Nichols filed a permanency review report, in which she stated that respondent "started marriage counseling in efforts to reconcile with her husband." Nichols also reported that respondent obtained an order of protection against Kendall but remained in contact with him. Nichols noted that Kendall's drug screens in May and June 2023 were consistently positive for THC. Nichols stated in her report that Kendall's "decision making is of great concern" because he continued to "associate himself with [Samantha C.,] his ex-paramour."

¶ 36    G. Respondent Remains Unfit; Kendall Becomes Fit

¶ 37    On December 27, 2023, the State asked the trial court to find Kendall fit and change

the permanency goal to returning the children to Kendall in five months because "he's been clean for approximately two years." The State admitted "this is a highly unusual situation that dad has fought this hard to come through." The court appointed guardian *ad litem* (GAL) agreed with the State, explaining, "[T]his is really unusual, but [Kendall] does have a really extended period of sobriety and stability." The court entered an order finding Kendall fit and changed the permanency goal to "return home in 5 months to the father."

¶ 38    In her report filed with the trial court in May 2024, Nichols reported that respondent recently reengaged in counseling after a lapse because of "her insurance canceling." Kendall reported that he was in a romantic relationship with Samantha C., who "has an open [DCFS] case with Peoria County." Nichols noted: "[Kendall] has expressed that he would like to co-parent with [respondent], but he does have concerns with [Kristian] and how he may affect the children's safety." Respondent completed seven of eight scheduled drug screens from January to April 2024, which were all negative. From January to May 2024, Kendall completed seven of nine drug screens, which were all positive for THC.

¶ 39    On June 5, 2024, the trial court held a permanency review hearing. At the hearing, respondent's counsel argued that respondent should be found "fit but unable" based on "reasonable efforts and reasonable progress." The GAL recommended that respondent "remain unfit." The court entered an order finding respondent "unfit" and "unable." The court determined that respondent "has made mixed efforts [and] has made mixed progress" toward the return of her children because of a "[b]ad relationship and lack of counseling." The court found Kendall fit but had "mixed efforts" and "mixed progress" because of his "marijuana use." The court ordered custody of K.H. and B.H. to remain with Kendall and guardianship to continue with DCFS. The court instructed Kendall to stop using marijuana, explaining that "[s]obriety is not having any

substances in your system."

¶ 40 In August 2024, Nichols filed a report with the trial court. She stated that respondent "has made efforts to see her counselor at least once per month." Respondent reported to Nichols that she was diagnosed with situational depression and that her doctor told her "to take additional time off from work during her depressive states." Kendall reported that he lived with Samantha C. and she was expecting a baby in December. He also reported that he stopped smoking marijuana after the last court hearing. Kendall's drug screens in June were both positive for THC, while his screens in July and August were negative for all substances. Respondent completed all nine of her scheduled drug drops, which were negative for all substances.

¶ 41 Nichols documented in her report: "[Kendall] and [respondent] have both agreed that if [respondent] is granted parental fitness, they will share 50/50 custody. If [respondent] is not granted parental fitness, the family will continue supervised parent/child visits and make changes by having frequent conversations." Respondent visited the children twice a week, and Nichols reported that respondent "is appropriate, and the children enjoy spending time with her."

¶ 42 On September 25, 2024, the trial court held its final permanency review hearing. At the hearing, Nichols opined that respondent "has met minimum parenting standards." Nichols stated that respondent continued to reside with Kristian and had not been involved in a domestic violence incident since January 2023. Nichols learned shortly before the hearing that respondent's court supervision for a 2020 DUI was revoked because respondent failed to complete her court-ordered alcohol and drug treatment. Nichols stated that she was aware of respondent's 2020 DUI arrest, that respondent never told her the DUI was resolved, and that she never asked about the status of the DUI. Nichols also reported that respondent was recently off work for three weeks due to depression. Nichols opined that respondent is a "good co-parent with [Kendall]" and has a

bond with her children. Nichols reported that respondent was starting a new job soon and had sufficient income to support her children.

¶ 43    The State argued that respondent remained unfit, stating:

"The last time we were in court, she ended up home for three weeks with depression. I'm not judging that, but I'm saying that that's an issue. Real life problems come about and if you have to take off three weeks because you're depressed, how are you going to raise a child?

Her probation or court supervision is currently being revoked because she has not done the treatment that was ordered. She's not fit. She's not stable.".

Respondent's counsel argued that respondent should be found fit because she completed all court-ordered tasks, had a "strong bond" with her children, and was "able to co-parent" with Kendall. The GAL stated, "On paper, *** it would appear that [respondent] is fit, but the—the issue is—is *** omission." The GAL recommended that respondent remain unfit because of her "deception."

¶ 44    In its order, the trial court found respondent unfit and that she "made efforts but not progress toward return home." The court explained:

"The mother at times has made reasonable efforts. Her progress has been spotty at best.

She—we're in one of those situations again where if you complete services that doesn't mean you're applying the services or what you were supposed to have learned from the services. And if she continues to be in need of counseling, which it seems like she is, if she continues to be in need of—or has substance abuse problems, which it appears that she does.

- 10 -

This case is four years old. It started on April 15th of 2020. These issues, if they could have been addressed, should have been addressed within four years and yet we're still talking about them four years later. Obviously, the mother has not made reasonable progress. She remains unfit. The children have reached a state of permanence *** with father."

The court ordered: (1) custody and guardianship of B.H. and K.H. restored to Kendall, (2) the wardship terminated, and (3) the cases closed.

¶ 45         This appeal followed.

¶ 46                                    II. ANALYSIS

¶ 47                                    A. Unfitness

¶ 48         Respondent argues that the trial court's ruling that she remained unfit was against the manifest weight of the evidence because she completed all court-ordered services and, according to Nichols, "met minimum parenting standards." The State responds that respondent remained unfit because she continued to reside with Kristian, an unfit parent.

¶ 49         A trial court may commit a minor to DCFS wardship if the court determines that the parents are

> "unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." 705 ILCS 405/2-27(1) (West 2020).

When a minor has been found by a court to be neglected or abused,

> "custody of the minor shall not be restored to any parent *** whose acts or omissions or both have been identified *** as forming the basis for the court's

finding of abuse or neglect, until such time as a hearing is held on the issue of the best interests of the minor and the fitness of such parent *** to care for the minor without endangering the minor's health or safety, and the court enters an order that such parent *** is fit to care for the minor." 705 ILCS 405/2-23(1)(a) (West 2020). The State bears the burden of proving a parent's unfitness by a preponderance of the evidence. *In re K.E.S.*, 2018 IL App (2d) 170907, ¶ 51.

¶ 50 The trial court's finding of unfitness is accorded great deference because its "opportunity to view and evaluate the parties and their testimony is superior to that of the reviewing court." *In re Latifah P.*, 315 Ill. App. 3d 1122, 1128 (2000). A court's fitness determination will be reversed only if it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). "A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident." *C.N.*, 196 Ill. 2d at 208.

¶ 51 The State contends that the trial court's finding of unfitness was not against the manifest weight of the evidence because respondent continued to live with Kristian, an "unfit parent." While the court did not mention this as a basis for its unfitness finding, "we may affirm the trial court's decision on any basis established by the record." *In re K.B.*, 314 Ill. App. 3d 739, 751 (2000). A parent's residence with an individual who poses a danger to children can be the basis for a court's unfitness finding. See *In re H.S.*, 2016 IL App (1st) 161589, ¶¶ 29-30; *In re April C.*, 326 Ill. App. 3d 225, 241 (2001).

¶ 52 Here, the record shows there have been concerns about respondent's relationship with Kristian since its inception. At the June 8, 2021, permanency review hearing, the trial court found respondent unfit because of information provided at the hearing about Kristian. The record on appeal does not contain a transcript of that hearing, so we do not know what information was

provided to the court. However, respondent, as the appellant, "has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

¶ 53 Nichols repeatedly referred to Kristian as "unfit" in her reports and opined that the minors' reunification with respondent was not possible because respondent continued to reside with Kristian. Additionally, Kendall expressed concerns about K.H.'s and B.H.'s safety with Kristian. In light of the concerns raised by the court, Nichols, and Kendall, the trial court's finding that respondent was unfit was not against the manifest weight of the evidence because K.H. and B.H. may be in danger if they are returned to respondent's home, where Kristian also lives. See *H.S.*, 2016 IL App (1st) 161589, ¶¶ 29-30; *April C.*, 326 Ill. App. 3d at 241.

¶ 54                                      B. Termination of Wardship

¶ 55 Respondent contends that the trial court erred in terminating the wardship because the evidence showed that she was fit and had a strong bond with K.H. and B.H. The State responds that the court did not abuse its discretion in terminating the wardship because K.H. and B.H. found much-needed permanency with Kendall.

¶ 56 "A trial court's determination to terminate wardship is reviewed under the manifest-weight-of-the evidence standard when the court's weighing of the facts is at issue; otherwise, it is reviewed for abuse of discretion." *In re Aaron R.*, 387 Ill. App. 3d 1130, 1141 (2009). A judgment is against the manifest weight of the evidence only when the opposite conclusion is "clearly evident." *C.N.*, 196 Ill. 2d at 208. "A court abuses its discretion where its decision is 'arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it.' " *In re*

*Joseph J.*, 2020 IL App (1st) 190305, ¶ 26 (quoting *People v Rivera*, 2013 IL 112467, ¶ 37).

¶ 57 Terminating wardship and closing a case is warranted where the "health, safety, and the best interests of the minor and the public no longer require the wardship of the court." 705 ILCS 405/2-31(2) (West 2022). When determining best interests, the court must consider the following factors, "in the context of the child's age and developmental needs:

(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) he development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2022).

¶ 58     Here, the trial court terminated the wardship and closed the cases because (1) respondent was making reasonable efforts but not reasonable progress toward the return of K.H. and B.H., (2) the minors had achieved permanency with Kendall, and (3) respondent remained unfit. As set forth above, the court's determination that respondent remained unfit was not against the manifest weight of the evidence. However, the court's other justifications for terminating the wardship are not supported by the evidence.

¶ 59                              1. *Reasonable Progress*

¶ 60     "Reasonable progress 'is an objective review of the steps the parent has taken toward the goal of reunification.' " *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067 (2004) (quoting *In re B.S.*, 317 Ill. App. 3d 650, 658 (2000), *overruled on other grounds in In re R.C.*, 195 Ill. 2d 291, 304 (2001)). Completion of court-ordered services alone may not be sufficient to demonstrate reasonable progress. See *In re R.L.*, 352 Ill. App. 3d 985, 999 (2004). Rather, the respondent must demonstrate an ability "to implement the skills taught." *R.L.*, 352 Ill. App. 3d at 999.

¶ 61     In ruling that respondent failed to make "reasonable progress," the trial court found that although respondent completed all court-ordered services, she had not applied what she was taught because she "continues to be in need of counseling" and "has substance abuse problems." The record does not support these concerns as bases to find that respondent failed to make reasonable progress.

¶ 62     First, as the trial court acknowledged, respondent completed all court-ordered

- 15 -

services, including individual counseling. Aside from a lapse for a few months due to an insurance issue, respondent was continuously engaged in counseling with the same therapist since 2020. Respondent's therapist reported seeing respondent at least monthly. Nevertheless, the court found that respondent did not show reasonable progress because of her ongoing need for counseling. The only mental health issue mentioned at the final dispositional hearing was respondent's depression. However, depression itself does not render a parent unfit. *In re A.T.*, 2015 IL App (3d) 140372, ¶ 16. "Rather, it is the actual conduct and behavior of the parent that is determinative on the question of fitness, not the label associated with such conduct or behavior." *A.T.*, 2015 IL App (3d) 140372, ¶ 16. Here, the evidence showed that respondent took off three weeks of work because of depression. However, there was no evidence that respondent's depression in any way affected her relationship with her children or her ability to parent. Nothing in the record suggested that respondent's depression made her unable to visit or interact with K.H. and B.H. during the three-week period when she did not work. Thus, respondent's struggles with depression did not justify a finding that respondent failed to make reasonable progress toward reunification with her children, and the court's finding to the contrary was against the manifest weight of the evidence.

¶ 63        Additionally, the trial court's determination that respondent failed to make reasonable progress because she "has substance abuse problems" was against the manifest weight of the evidence. Respondent completed a substance abuse assessment in January 2021. As a result of that assessment, no substance abuse treatment was recommended. Respondent submitted to drug drops for over four years, and all drops completed were negative for all substances. While respondent was arrested for DUI in 2020, there was no evidence that respondent had any alcohol-related convictions or incidents in the four years since then. Thus, the evidence does not support the court's finding that respondent "has substance abuse problems."

¶ 64 Furthermore, the trial court's determination that respondent did not apply what she learned in the services she completed was not supported by the evidence. K.H. and B.H. came into care because of domestic violence between respondent and Kendall. Immediately after the minors were removed from her care, respondent separated from Kendall. Soon thereafter, respondent began a relationship with Kristian and was the victim of a domestic violence incident with him in January 2023. However, at the time of the final dispositional hearing, respondent had not been involved in a domestic violence incident in 19 months and was engaged in marriage counseling with Kristian. Thus, the evidence does not support the court's conclusion that respondent did not apply what she learned in court-ordered services, including counseling and domestic violence classes, to remove domestic violence from her life.

¶ 65 For these reasons, the trial court's determination that respondent failed to make reasonable progress toward the return of K.H. and B.H. was against the manifest weight of the evidence and should not have been used as a basis for terminating wardship and closing the cases.

¶ 66                                    2. *Permanence*

¶ 67 In determining the best interest of minors, the trial court must consider "the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives." 705 ILCS 405/1-3(4.05)(g) (West 2022). Here, the trial court found that K.H. and B.H. had "reached a state of permanence" with Kendall. However, a review of the record shows that the "permanence" K.H. and B.H. achieved with Kendall was tenuous, at best, based on the history of this case.

¶ 68 For the first year that K.H. and B.H. were in care, Kendall had no contact with them and completed no services. A little over a year after the minors came into DCFS custody, Kendall was hospitalized for six weeks with heart and kidney failure, presumably caused by heroin. Just a

few months later, Kendall overdosed on heroin during a visit with K.H. and B.H. Shortly after that, Kendall participated in inpatient substance abuse treatment, which he successfully completed. Around the same time, the State filed a petition to terminate Kendall's parental rights, and Nichols opined that it was in the best interest of the minors to do so. Kendall did not visit with K.H. and B.H. again until May 2022. Four months later, Kendall began an on-and-off relationship with Samantha C., who was "also involved with DCFS." As of May 2024, Kendall and Samantha were living together, and Samantha was pregnant and expected to give birth in December. Additionally, from May 2022 to June 2024, Kendall's drug screens were repeatedly positive for THC, even though the DCFS service plan required him to refrain from all "mind[-]altering substances."

¶ 69        Thus, at the time of the final permanency hearing, Kendall had been completely drug-free for a period of only two months, K.H. and B.H. had been living with Kendall for approximately five months, and Kendall was living with a woman who was also involved in DCFS and expecting a baby in three months. While the trial court noted that K.H. and B.H. had been in care for over four years, for more than half that time, Kendall was unfit and had little to no relationship with K.H. and B.H. We recognize that Kendall has done much to turn his life around and is now prioritizing K.H. and B.H. However, Kendall's decision to do so has been relatively recent. In light of the unique facts of this case, the court's determination that K.H. and B.H. had achieved permanence with Kendall was against the manifest weight of the evidence.

¶ 70        3. *Trial Court Abused Its Discretion in Terminating Wardship*

¶ 71        Because two of the three bases for the trial court's decision to terminate the wardship were against the manifest weight of the evidence, the court's termination of the wardship was against the manifest weight of the evidence and an abuse of discretion.

¶ 72        Thus, we reverse the trial court's order terminating the wardship and closing the

cases. We remand the cases to the court with directions to reopen the cases, reinstate wardship, and set permanency reviews at reasonable intervals so that K.H. and B.H. can achieve true "permanency." The court may terminate the wardship and close the cases when it finds the "health, safety, and the best interests of the minor[s] and the public no longer require the wardship of the court." 705 ILCS 405/2-31(2) (West 2022).

¶ 73                                III. CONCLUSION

¶ 74        For the reasons stated, we reverse the trial court's judgment and remand the case for further proceedings to include reinstating the wardship and holding permanency reviews at reasonable intervals for a reasonable length of time.

¶ 75        Reversed and remanded with directions.