NOTICE
Decision filed 01/24/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 210270-U

NOS. 5-21-0270, 5-21-0271 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* J.H. and Z.H., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Madison County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 16-JA-50 & 16-JA-51 |
| | ) | |
| Kelsey G., | ) | Honorable |
| | ) | Amy Maher, |
| Defendant-Appellant). | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Moore and Wharton concur in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's findings that (1) defendant-mother was unfit due to her failure to make reasonable progress toward the return of the minors, and (2) it was in the best interests of the minors that defendant-mother's parental rights be terminated are affirmed, where the findings were not against the manifest weight of the evidence.

¶ 2    Defendant, Kelsey G., appeals the trial court's orders terminating her parental rights to J.H. and Z.H.,[1] claiming the trial court's findings of unfitness and best interests were in error. For the following reasons, we affirm the trial court's decision.

_____

[1]This is a consolidated appeal as the same parties and same set of facts exist and the hearings on both cases occurred simultaneously. The record and report of proceedings from 5-21-0271 have been transferred and made a part of 5-21-0270 for appeal purposes.

1

¶ 3                                    I. BACKGROUND

¶ 4      J.H. was born February 3, 2014, and Z.H. was born April 21, 2013. On March 29, 2016, the State filed mirror juvenile petitions alleging the children were neglected in that they were in an environment that was injurious to their welfare. A shelter care hearing was held the same day. The trial court found probable cause existed for the filing of the petition, that it was an immediate and urgent necessity that the children be removed from the home, and that leaving the children in the home was contrary their health, welfare, and safety. The court placed J.H. and Z.H. in the temporary custody of the Department of Children and Family Services (DCFS) and ordered supervised visitation with their mother, Kelsey. On October 28, 2016, the court entered an order for continuance under supervision rules, with Kelsey admitting, *inter alia*, that "Mother has mental health issues which impairs [*sic*] her ability to adequately care for the minor[s]."

¶ 5      Shortly thereafter, on November 28, 2016, the State filed a petition to revoke the order for continuance under supervision rules. The State alleged that Kelsey had been arrested and jailed for DUI, failed to create an adequate care plan for the children, and continued to abuse substances while in a primary caregiving role for the children. The petition asked the court to enter an order revoking the rules and adjudicating J.H. and Z.H. neglected, and requested a shelter care hearing.

¶ 6      A hearing on the petition to revoke was held on December 8, 2016, wherein the court found probable cause existed and that it was an immediate and urgent necessity that the children be removed from the home. The court again entered an order granting temporary custody of J.H. and Z.H. to DCFS. On March 16, 2017, Kelsey agreed to the entry of an adjudicatory order. The court found the children to be neglected in that they were in an environment that was injurious to their welfare. It based its findings on Kelsey's previous stipulation that "Minor's Mother has mental health issues which impairs [*sic*] her ability to adequately care for the minor[s]." The parties agreed

2

to the entry of a dispositional order the same day, which granted custody and guardianship of J.H. and Z.H. to DCFS, and ordered unsupervised visitation with Kelsey, at the agency's discretion. After an agreed continuance was granted, the court held the first permanency hearing and entered its order on October 17, 2017. Subsequent permanency hearings were held thereafter, and on March 5, 2021, the State filed its amended petition for termination of parental rights and for appointment of guardian with power to consent to adoption. The petition alleged, in pertinent part, that Kelsey was an unfit person to have the children due to: (1) her failure to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minors (750 ILCS 50/1(D)(b) (West 2020)) and (2) her failure to make reasonable progress toward the return of the minors to her care during any nine-month period following the adjudication of neglect or abuse, specifically the time period from March 17, 2019, through December 17, 2019 (*id.* § 1(D)(m)(ii)). On May 20 and 21, 2021, the court conducted the fitness portion of the termination proceedings.

¶ 7    The State's first witness was Thaila McCoy, a caseworker with Hoyleton Youth and Family Services which contracted with DCFS to assist with the implementation of service plans for families. She served as the caseworker for the family during the nine-month period from March 17, 2019, to December 17, 2019. When she took over the case, she met with her supervisor and reviewed the notes and reports of the family's previous eight caseworkers to familiarize herself with the case. Thaila prepared an updated service plan for the family on March 17, 2019. The initial goals and tasks remained the same as set forth in the initial service plan. One such task was that Kelsey would understand how mental health issues affected her parenting and relationships. Included in the goals were Kelsey's obtaining a mental health assessment and following all recommendations, obtaining a substance abuse assessment and following all recommendations, and obtaining a domestic violence assessment and following recommendations.

3

¶ 8    At the time of hearing, Kelsey had completed the domestic violence portion of the plan and Thaila had no concern regarding the substance abuse portion. The concern came with the mental health tasks. Thaila stated that Kelsey's mental health was a concern because of Kelsey's exhibited anger issues, past trauma, depression, and anxiety. The agency was concerned about Kelsey's mental health as it related to her parenting because "her mental health could get in the way of her appropriately and safely parenting her children." Kelsey completed the mental health assessment and had been counseling with Ashley Duffie, a therapist at Hoyleton, for some time. Thaila stated that Kelsey attended only five sessions from March 17, 2019, to December 17, 2019. Thaila reached out to the therapist from time to time about Kelsey's negative behavior toward caseworkers and supervising staff, finding that Kelsey's behavior would only briefly improve afterward. Kelsey was closed out of counseling in November 2019 due to her nonattendance. Thaila stated that Kelsey had self-disclosed that she had been diagnosed with bipolar disorder as a teen. Kelsey was not regularly taking her prescribed psychotropic medication, but rather, told Thaila that she wished to use alternative methods. Kelsey never informed her of any change in diagnosis; nor did she reach out to her for assistance in getting her medication changed or with finding a psychiatrist.

¶ 9    Although Kelsey acted appropriately with the children when Thaila was present, she received numerous reports of Kelsely exhibiting inappropriate and outrageous verbal aggression with the supervising agency staff and, at times, the children, throughout the time period at issue. Some of the supervising staff were removed from the case for their involvement in the disagreements. Kelsey also exhibited consistent, inappropriate verbal abuse against Thaila, to the point that she had to block Kelsey from contacting her on her cell phone. The verbal abuse consisted of Kelsey's use of profanity and vile name-calling directed toward her personally.

4

Kelsey's visitation never progressed from supervised visits to unsupervised due to her lack of progress in her services. Overall, Thaila observed no improvement in Kelsey's mental health as Kelsey did not exhibit progress in learning and demonstrating an understanding of how her mental health impacted her life and parenting.

¶ 10    The State next called Ashley Duffie to testify. She was employed by Hoyleton and began counseling with Kelsey as her mental health therapist in January 2018. Kelsey was scheduled to attend sessions weekly. She attended five sessions and had one other contact with Ms. Duffie between March 17, 2019, and December 17, 2019. Ms. Duffie opined that Kelsey's lack of engagement during that time period was not indicative of her attendance over the course of 3½ years. Unexpected events took place; Kelsey's mother died in March and Ms. Duffie broke her leg in July. She averred that Kelsey's mother's death caused Kelsey to retreat from counseling, likely as part of her grieving process. Kelsey reengaged in counseling in December 2019 and had been consistent since then. Ms. Duffie diagnosed Kelsey with posttraumatic stress disorder and borderline personality disorder. She stated that Kelsey's earlier diagnosis of bipolar disorder was erroneous and the medication for such was countereffective and detrimental to her progress. She did not discuss this issue with the caseworker.

¶ 11    Ms. Duffie testified that she worked with Kelsey on emotional regulation. At times, she observed in Kelsey improvement and progress with managing her emotions and understanding how her behavior affected the children. Kelsey's emotional dysregulation was mainly triggered by anything involving her children. As such, her behavior toward the caseworkers and supervisors would be understandable as Kelsey felt they were not doing their jobs. Ms. Duffie testified that if the borderline personality disorder symptoms were managed, Kelsey could parent effectively.

¶ 12   Kelsey also testified and the following exchange with the prosecutor occurred at the beginning of her testimony:

"Q. And what is your understanding of why they are currently in foster care?

A. I'm not really sure.

Q. Do you—what's your understanding of why they originally came into foster care?

A. Same answer; I'm not really sure.

Q. How long have they been in foster care?

A. Five years.

Q. Okay. And were you provided with service plans to complete in order to assist you in getting your kids back?

A. Yes.

Q. Now, I want to take you back to March of 2019. Did you have a service plan at that time?

A. Yes.

Q. And what were some of the services—and tasks you were asked to do at that time?

A. Comply with mental and substance and medication."

¶ 13   Kelsey testified that she understood that in order to get her children returned, she had to complete the tasks in her service plan. She completed domestic violence counseling and complied with the expectations related to substance abuse. She took several mental health assessments, counseled with Ms. Duffie, and even for a time took medication she knew she did not need. Her diagnoses were post traumatic stress disorder and borderline personality disorder. In March 2019,

6

Ms. Duffie was still her mental health counselor. Kelsey knew counseling was important, but "I had to step back and regroup for myself." While she only attended five therapy sessions from March 17, 2019, until December 17, 2019, she was working on her mental health herself and was not regressing. During the time period at issue, she found employment, housing, and transportation without needing "someone else holding my hand."

¶ 14    Kelsey testified that there were instances during that time period when there was nasty communication with Thaila. On one occasion, she called Thaila a "f*** c***" and, on another, a "f*** b***." She felt "[t]he actions fit" and the name-calling was deserved because Thaila was failing her family, and was "a very mean type of person, not necessarily built for a caseworker." Throughout the case, Kelsey's visits with the children never changed; she received one supervised visit each week. Kelsey stated that Thaila never told her that she no longer needed to attend counseling. Neither did Ms. Duffie tell her she no longer needed therapy. Kelsey felt that she did not need a set hour every week for counseling and that she and Ms. Duffie had regular telephone communications during the time period at issue. Kelsey opined that counseling was not the "best fit medically or professionally" and she "needed to do stuff on my own" and to "be my own strong pillar." She also did not think she had an anger problem or any issues in controlling her emotions. Her lashing out at caseworkers and visitation supervisors was not initiated by her, but was "a response to something." She "didn't blatantly attack anybody without feeling attacked first" and was "only like that when it comes to my kids." She stated there were no problems at the visits except for "other people overstepping their boundaries."

¶ 15    In March 2019, Kelsey was informed by the agency that her mother was dying. This was a traumatic event for her yet agency workers were indifferent toward her. When she asked to be in contact with her mother through messages and notes, her request was denied. After her mother's

7

death, Kelsey was psychiatrically hospitalized. Kelsey quit taking her medications while she was counseling with Ms. Duffie. The medication was for bipolar disorder, which was an erroneous diagnosis. It was given by a psychiatrist who evaluated her for only 45 minutes over five to seven days during a previous psychiatric hospitalization. Kelsey spoke to Ms. Duffie about the diagnosis and Ms. Duffie, too, said that the diagnosis was incorrect and gave her permission to stop taking it.

¶ 16    On June 4, 2021, the trial court issued its order on the petition to terminate. The court found the State failed to meet its burden for unfitness on the allegation that Kelsey failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the children. However, the court found the State met its burden by clear and convincing evidence on the allegation that Kelsey was unfit to parent the children due to her failure to make reasonable progress toward the return of the children to her care for the nine-month period between March 17, 2019, and December 17, 2019. It noted that "[m]other failed to follow through with treatment designed to assist in managing her mental health issues and enable her to provide a safe and stable home for the minors." The court continued,

> "her attention during this period seemed to be directed at fighting with the agency more than working toward the return of her children. It is most concerning to the Court that during her testimony she was unable to identify the issues that resulted in the placement of the children at the beginning of the case and why the children remained in care for this lengthy period of time. Despite the long duration of the case and the numerous services provided, Respondent Mother showed no insight into the issues that resulted in the filing of the case, the adjudication, or the need for services to correct issues."

¶ 17    On July 15, 2021, the court conducted an *in camera* interview of Z.H. along with his older sibling, A.G., who is not a subject of this appeal. In pertinent part, Z.H. told the court that he enjoyed having visits with Kelsey and wanted to return to Kelsey. However, he was comfortable

8

and liked living with his foster parents, he called them "mom" and "dad," and would be sad if he had to leave them.

¶ 18     On July 15, 2021, and July 19, 2021, the court conducted the best interest portion of the termination proceedings. Melanie Brockington testified that she was employed as a DCFS caseworker and had been assigned to the family's case for 7½ to 8 months at the time of hearing. Melanie stated that J.H. and Z.H. were placed together and were the only children in the foster home. The children had been in this placement for around three years. The foster parents moved from a predominantly caucasian area to a more culturally diverse area as the children were biracial. They also took the children to the children's home church, which was also more diverse. The foster parents participated in and supported cultural activities to foster the children's racial heritage. The children were very connected to their foster parents and were comfortable in the home. The foster parents were attentive to the children's needs and took those needs seriously. They made sure the children received any needed services. The foster parents were employed and could meet the children's needs. The children looked to them for guidance and were bonded to them. The foster parents also facilitated visits between J.H. and Z.H. and their other siblings. Ms. Brockington stated that she believed the foster parents would not only continue to support those visits, but would also allow a relationship with Kelsey to continue, within parameters. The foster parents had signed permanency paperwork and were committed to adopting J.H. and Z.H.

¶ 19     Kelsey testified that the foster parents interfered with and canceled visits. The foster parents allowed the children too much electronic screen time; if they were in her care, they would be more active. She was sure the foster parents would not allow Kelsey to see the children if they adopted them. Kelsey did not believe the foster parents were fostering a tie to the children's African American heritage. If the children were with her, the children would be exposed to African

9

Americans, particularly her boyfriend and his family. Kelsey would never harm the children. She had stable housing adequate for the children. She continued to be in counseling services. Kelsey would maintain contact with the children's other siblings. She would be involved in the children's education and advocate for them.

¶ 20　The guardian *ad litem*, Ms. Reed, then presented her oral report to the court. She had been the children's guardian *ad litem* from the inception of the case. She had met with J.H. and Z.H. more than 10 times over the course of the pendency of the case. She had contact with the foster parents, both in person and by telephone. The children were in therapy and told her they enjoyed it. The foster parents had been supportive of reunification between the children and Kelsey if it was in the children's best interests to do so. Ms. Reed observed the children's use of screen time during her visits and had no concerns. Kelsey had completed her services, but had not demonstrated learning from them. The children needed permanence. The foster parents were committed to them and had been since the children were placed with them. The children had no recollection of having lived with Kelsey. Ms. Reed's recommendation to the court was, "I 100 percent believe that it is in the best interest of the minors for the parental rights to be terminated and the minors freed for adoption."

¶ 21　On August 4, 2021, the court issued its written order finding the State met its burden by a preponderance of the evidence that it was in the minors' best interests to terminate Kelsey's parental rights. The court stated that the negative effect on the minors was due to Kelsey's failure to demonstrate sufficient progress to allow even unsupervised visits, let alone return of the minors to her custody and care. It further stated Kelsey "has not shown an ability to use the information provided to ensure a safe and stable environment for the minors. She remains focused on her grievances with the caseworkers and foster parents, and not on the impact her behaviors and her

continued hostility are having on her children." The court noted that the foster parents provided a safe and stable home for the children, had taken steps to meet the minors' educational and behavioral needs, ensured the minors were connected to their ethnic identity and culture, and had shown their commitment to permanency for the minors. The court stated "[t]he minors deserve permanence and stability, and that will best be achieved if they are able to remain in their current home, without the uncertainty of if or when they might be able to return to their mother." The trial court found termination of Kelsey's parental rights to be in the children's best interests and vested guardianship in the guardianship administrator for DCFS with the power to consent to the minors' adoptions.

¶ 22                                  II. ANALYSIS

¶ 23                                    A. Fitness

¶ 24     On appeal, Kelsey first argues that the trial court erred in finding her unfit. She argues that the findings were not supported by clear and convincing evidence that she failed to make reasonable progress toward the return of the minors to her during any nine-month period following the adjudication of the neglect of the minors under section 1(D)(m)(ii) of the Adoption Act. 750 ILCS 50/1(D)(m)(ii) (West 2020).

¶ 25     Section 1(D)(m)(ii) of the Adoption Act provides:

> "D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following, except that a person shall not be considered an unfit person for the sole reason that the person has relinquished a child in accordance with the Abandoned Newborn Infant Protection Act:
>
> * * *
>
> (m) Failure by a parent *** (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor ***. If a service plan has been established as required *** to correct the conditions that were the basis for the

11

removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care during any 9-month period following the adjudication ***." *Id.*

¶ 26 "The State must prove by clear and convincing evidence that a respondent was an unfit parent." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). Clear and convincing evidence is said to require proof greater than a preponderance of the evidence but less than proof beyond a reasonable doubt. *In re D.T.*, 212 Ill. 2d 347, 362 (2004). Section 1(D)(m)(ii) provides that unfitness can be established when a parent fails to "make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of a neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2020). "Reasonable progress 'is an objective review of the steps the parent has taken toward the goal of reunification.' " *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067 (2004) (quoting *In re B.S.*, 317 Ill. App. 3d 650, 658 (2000), *overruled on other grounds in In re R.C.*, 195 Ill. 2d 291, 304 (2001)).

¶ 27 "A trial court's finding of unfitness is afforded great deference because it has the best opportunity to view and evaluate the parties and their testimony; the trial court's finding will not be disturbed on appeal unless it is against the manifest weight of the evidence." *In re Daphnie E.*, 368 Ill. App. 3d at 1064 (citing *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002)). For a decision to be against the manifest weight of the evidence, it must be shown that "the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, or not based on the evidence presented." (Internal quotation marks omitted.) *In re I.W.*, 2018 IL App (4th) 170656, ¶ 35.

¶ 28 In this case, the State provided ample evidence from which the court could find, by clear and convincing evidence, that Kelsey was unfit to parent J.H. and Z.H. due to her failure to make reasonable progress toward the return of the children to her during the nine-month period from

12

March 17, 2019, to December 17, 2019. It was uncontroverted that Kelsey attended only five counseling sessions during the nine-month time period at issue. Instead, she chose to halt counseling on her own. It is uncontroverted that she was not taking her prescribed medications and had not sought psychiatric assistance in obtaining different medications, if needed. It was also uncontroverted that Kelsey continued throughout the case to display extreme outbursts with caseworkers and visitation supervisors and that some of these outbursts occurred in the presence of the children. We further note that the trial court found that while Kelsey made progress in completing her services, she never demonstrated an understanding of how her mental health issues affected her parenting and relationships.

¶ 29    On review, we "will not reweigh the evidence or reassess the witnesses' credibility." *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). When evaluated objectively, an opposite conclusion to the trial court's conclusion that Kelsey was unfit is not clearly evident. Neither is the trial court's determination unreasonable, arbitrary, or not based on the evidence presented. Thus, we find the trial court's determination of unfitness is not against the manifest weight of the evidence and affirm the trial court's finding of unfitness.

¶ 30                          B. Best Interest

¶ 31    Kelsey also contends that the trial court erred when it found by a preponderance of the evidence that it was in the children's best interests to terminate her parental rights. The State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re D.T.*, 212 Ill. 2d at 366. "A preponderance of evidence is that amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not." *In re K.O.*, 336 Ill. App. 3d 98, 107 (2002). After the court has made a finding of unfitness, "the focus shifts to the child. The issue is no longer whether parental rights *can* be terminated; the issue is whether, in

light of the child's needs, parental rights *should* be terminated. Accordingly, at a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." (Emphases in original.) *In re D.T.*, 212 Ill. 2d at 364. "We will not disturb a court's finding that termination is in the children's best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005) (citing *In re M.F.*, 326 Ill. App. 3d 1110, 1115-16 (2002)).

¶ 32    When considering best interests, the court shall consider the following statutory factors in the light of the child's age and developmental needs: (1) the physical safety and welfare of the child (including food, shelter, health, and clothing); (2) the development of the child's identity; (3) the child's background and ties (including familial, cultural, and religious); (4) the child's sense of attachments (including where the child actually feels love, attachment, and a sense of being valued); (5) the child's sense of security; (6) the child's sense of familiarity; (7) the continuity of affection for the child; (8) the least disruptive placement alternative for the child; (9) the child's wishes and long-term goals; (10) the child's community ties (including church, school, and friends); (11) the child's need for permanence (including the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives); (12) the uniqueness of every family and child; (13) the risks attendant to entering and being in substitute care; and (14) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2020). "The court may also consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon his or her emotional and psychological well-being." *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 30. Although all these factors must be considered, no single factor is dispositive. *Id.* ¶ 31. It is not required that

the trial court's determination of best interests explicitly refer to each of these factors. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 33 In the case now before us, a plethora of evidence was presented from which the court could find, by a preponderance of the evidence, that the best interests of the children would be best served by terminating Kelsey's parental rights. The children lived with the same foster family for over three years and were bonded to them. The foster parents took steps to connect the children to their cultural heritage and worked to meet the children's educational needs. The foster parents also took steps to manage the children's difficult behaviors. They were committed to providing permanency for the children and continuing the children's sibling relationships. They even committed to fostering a relationship between the children and Kelsey, provided the relationship was healthy. In short, the evidence supported a finding that the foster family would provide a stable, safe, and loving home environment for the children. While Kelsey undoubtedly loves her children and has worked hard toward the completion of her services, the evidence also supported the trial court's finding that her inability to use the information provided by the services undermined her ability to provide a safe and stable home for the children. Accordingly, we find that the trial court's determination that it was in the children's best interests to terminate Kelsey's parental rights was not against the manifest weight of the evidence.

¶ 34                                    III. CONCLUSION

¶ 35 For the foregoing reasons, the trial court's decision to terminate Kelsey's parental rights is affirmed.

¶ 36 Affirmed.